No. 24929

In the Matter of the Petition of CF&I Steel Corporation to Change the Point of Diversion of Certain Water Rights in Water District No. 12 of the State of Colorado, CF&I Steel Corporation v. William F. Rooks, S. Parker Woolmington, Joseph Cogan, Glen McMurry, Ralph L. Scanga, Malcom A. McDougall, John Tancik, R. R. Morris, George E. Everett, Donald Mumma, J. H. Lionelle, Edward Kochman, Delbert Sack, and the Division Engineer for Water Division No. 2 in the State of Colorado

(495 P.2d 1134)

Decided April 10, 1972.

Welborn, Cook, Phipps & Brown, David R. Phipps, Robert F. Welborn, for petitioner-appellant.

Witty & Sandell, Mack Witty, for protestants-appellees.

*En Banc.*

MR. JUSTICE GROVES delivered the opinion of the Court.

C. F. & I. Steel Corporation, referred to as the petitioner,

sought to change the point of diversion of its decreed right of 5.7 cubic feet of water per second of time (cfs) for the Oak Creek Mining and Irrigating Ditch. The trial court held in favor of protestants, permitting the change as to one cfs and prohibiting any change of the remaining 4.7 cfs. We reverse and hold that the point of diversion of the entire water right may be changed.

The water involved is from the Arkansas River. Many years ago the headgate of this ditch was at Cotopaxi. While the headgate was so located there was a consumptive use of 40% to 50% of water, *i.e.*, 40% to 50% of the water diverted at the headgate did not return to the stream after use. Later the water right was transferred a few miles downstream and diversion was made at Parkdale for industrial purposes. There the consumptive use was 10% to 30%. The plant at Parkdale has ceased operations.

The petitioner acquired this water right in 1968. It then filed a petition to change the point of diversion from Parkdale to the headgate of the Minnequa Canal, which is 14 miles downstream from Parkdale. It proposes to transport the water 46 miles in the Minnequa Canal to its plant at Pueblo, there returning the water remaining to the Arkansas River. The court found that the transportation loss from Parkdale to the Pueblo plant *plus* the consumptive use will approximate 11.5% of the water or about 0.5 cfs. The testimony disclosed that over half of this percentage was lost in transportation, and it follows that a portion of the transportation loss in the Minnequa Canal would return to the stream. Therefore, more water will return to the river under the proposed diversion than was returned under the Parkale operation.

The decreed priority date of the water involved is December 15, 1881. In proceedings to change a point of diversion the court must make conditions so that appropriators, and particularly junior appropriators, will not be injured by the change. The great bulk of the senior rights to water in the Arkansas River have their diversions below the point of discharge of water from the Pueblo plant into the river. The

result is that a large quantity of water must be permitted to flow past the Parkdale-Pueblo area in order to satisfy these lower senior rights. At one point in this area the average flow is 1863 cfs.

■ Only four of the protestants appeared at the hearing and one of these was not the owner of a water right. With the consent of all counsel, all but three of the protestants were dismissed from the proceeding. We have for consideration, therefore, only the possible injury to these three. *Brighton Co. v. Englewood,* 124 Colo. 366, 237 P.2d 116 (1951).

■ The protestants divert their water above Parkdale. They, therefore, cannot capture the Parkdale return flow. There are other appropriators, senior to the protestants but junior to the petitioner whose headgates are on the Arkansas River at points between Parkdale and Pueblo. The basis of the trial court's judgment was that the 4.7 feet of return flow under the Parkdale use might be used by these intervening appropriators; but that, if the point of diversion were changed as proposed, none of the water to be taken at the headgate of the Minnequa Canal could be used by these intervening appropriators, who would make calls upon the protestants. Our reading of the record fails to disclose facts justifying these conclusions. There was no testimony that the intervening appropriators ever had made a call on upstream appropriators nor that they were dependent upon the Parkdale return flow.

The significant facts brought out at the hearing were that these junior appropriators are in fact benefited because with the proposed change of point of diversion the petitioner would put more water back in the stream for the downstream senior appropriators than would have gone into the stream in the Parkdale operation. As a result, the calls by the downstream senior appropriators upon the junior appropriators will be reduced by this small excess of return flow.

The trial court relied on the standard contained in *Farmers Highline Canal v. City of Golden,* 129 Colo. 575 at 586, 272 P.2d 629 (1954): "that the stream may remain as it was, and not suffer depletion. . . ." So far as these junior appropriators

are concerned, on account of the present necessity to allow the water to flow downstream to the senior appropriators, the stream will remain as it was and not suffer depletion.

The petitioners presented expert witnesses who testified that the junior appropriators would not be injured by the proposed change. The protestants produced no expert testimony. Some of them testified that they thought they would be injured by the change, but none of them gave facts to support their opinions.

■ There is one possibility of injury to junior appropriators who take water from the river above the headgate of the Bessemer Ditch. This headgate is located below the Minnequa headgate and above the Pueblo point of return. The decreed priority dates of the Bessemer Ditch are prior to those of the junior appropriators. In excess of 300 cfs is decreed to the Bessemer Ditch. There could be a situation in which the Bessemer Ditch would call for the water of the junior appropriators and under the Parkdale operation the Bessemer Ditch call would be 4.7 feet less. However, the record discloses that such a situation can arise only infrequently and we regard it, as well as any other use of Parkdale return flow, as *de minimis.* We gather from the record that the junior appropriators' small gain by reason of supplying senior appropriators with some more water under the proposed change outweighs any injury that might result from a call from the Bessemer Ditch.

■ As was the case in *City of Colorado Springs v. Yust,* 126 Colo. 289, 249 P.2d 151 (1952), the petitioner made a prima facie case in support of the change. It was then the responsibility of the protestants to show the injury resulting to them. They did not meet their burden of going forward with the evidence.

The petitioner has argued that the protestants have not shown ownership and therefore lack standing. With our disposition of this matter we do not reach that question.

The judgment is reversed and the cause remanded with directions that the court order the proposed change in point of diversion upon conditions to be specified by the court to

assure that the use be such as to produce a return into the river at Pueblo of the amount of water which the petitioner asserted by its evidence that it would return.