In the Matter of the APPLICATION FOR WATER RIGHTS OF CERTAIN SHAREHOLDERS IN the LAS ANIMAS CONSOLIDATED CANAL COMPANY, and the Consolidated Extension Canal Company, and Public Service Company of Colorado,

In the Arkansas River, In Bent County, Colorado.

Walter WAGNER, Kirk Wagner, Jackson K. Wagner, Florence Stephens, John Shiba, Alice Shiba, William R. Baker, Mary N. Baker, Eula Ridley, Robert W. West, Arlene West, Loyal S. Stephens, Irene B. Stephens, Harrell Ridley, Ollie Ridley, Loyde P. Gardner, Byrdie F. Gardner, Objectors-Appellants,

v.

Harvey D. ALLEN et al., Applicants-Appellees,

The Southeastern Colorado Water Conservancy District et al., Objectors-Appellees,

Robert W. Jesse, Division Engineer, Appellee.

No. 83SA60.

Supreme Court of Colorado, En Banc.

Sept. 17, 1984.

Calkins, Kramer, Grimshaw & Harring, Wayne B. Schroeder, P.C., David C. Hallford, Bruce D. Bernard, Denver, for objectors-appellants.

Kelly, Stansfield & O'Donnell, Timothy J. Flanagan, Holme Roberts & Owen, Kenneth J. Burke, Denver, for applicants-appellees.

KIRSHBAUM, Justice.

Objectors, minority shareholders in two mutual ditch companies, appeal a final decree entered by the district court for Water Division No. 2 approving an application for a change of water rights. We affirm, but remand with directions to amend the decree.

I

The Las Animas Consolidated Canal Company (Consolidated) is a mutual ditch company serving the irrigating needs of its shareholders on two ditches, the Consolidated or Riverside Ditch and the Jones Ditch. The Consolidated Extension Canal Company (Extension) is a mutual ditch company serving the irrigating needs of its shareholders on the Extension Ditch. The Extension Ditch is connected to the tail of the Jones Ditch.

Extension owns 95.07 of the 562 outstanding shares of Consolidated. There are 1,233.25 outstanding shares of stock in Extension. The water supply available to Consolidated, Extension, and their shareholders is derived from two sources: (1) water diverted from the Arkansas River at the Las Animas Consolidated Canal headgate, pursuant to certain surface water rights; and (2) withdrawals from wells. Consolidated owns the following direct flow surface water rights in the Arkansas River: (1) 22.3 cubic feet of water per second of time (c.f.s.) with a priority date of April 10, 1875; (2) 22 c.f.s. with a priority date of December 3, 1884; (3) 80 c.f.s. with a priority date of March 13, 1888. Extension owns two direct flow surface water rights in the Arkansas River: (1) 5.5 c.f.s. with a priority date of March 7, 1884;

and (2) 44.8 c.f.s. with a priority date of April 15, 1909.[1] Consolidated's 1888 priority of 80 c.f.s. and Extension's 1909 priority of 44.8 c.f.s. are junior priorities and, therefore, are rarely available for beneficial use. The three remaining priorities are senior priorities. Both companies are water short, due in part to over appropriations on the Arkansas River. Extension is water short when compared to Consolidated.

Shareholders of Consolidated and Extension also own decreed appropriation rights to certain wells which are supplied by the Arkansas River alluvial aquifer. Most of the well water rights have decreed annual appropriation limits; however, water from these wells has in the past been used only to supplement available surface water when shortages develop.

The Arkansas River flows from west to east through the portion of Las Animas County here involved. Its bed is north of and basically parallel to an Atchison, Topeka and Santa Fe Railroad Company track and north of the lands owned by the shareholders of the two companies. The Purgatoire River, flowing from southwest to northeast through some of the subject lands, joins the Arkansas at a point somewhat west of the John Martin Reservoir.

The delivery system involved here is composed of three major ditches—the Consolidated Ditch (commonly referred to as the Riverside Ditch), the Jones Ditch, and the Extension Ditch. Surface water is initially diverted from the Arkansas at the Consolidated Canal headgate to a point where a seven-foot Parshall flume is located. This flume is used to administer the water rights of Extension and Consolidated. Two major ditches originate close to this Parshall flume—the Riverside Ditch, used to irrigate lands to the north of the railroad track, and the Jones Ditch, located south of the track. At a point northwest of the Purgatoire River the Jones Ditch con-

nects to the Extension Ditch. The Extension ditch extends first southerly, then east under the Purgatoire River through a siphon with a maximum capacity of approximately 50–60 c.f.s., and finally northeasterly until it tails into the John Martin Reservoir. A seven-foot Parshall flume located near the junction of the Jones Ditch and the Extension Ditch is available for measurement of the water entering the Extension Ditch.

Historically, Consolidated and Extension shareholders have used the water represented by their shares in the companies for irrigation purposes only. In consideration of the short supply of water and the size and length of the ditches in question, when flows at the Arkansas River headgate do not exceed 49.8 c.f.s., Extension and Consolidated have operated a rotation program to allocate the available water.[2] Under this rotation plan, all available direct flow surface water from the Arkansas River is diverted into the Riverside Ditch for a few days, until Consolidated shareholders have irrigated the land north of the railroad track. The entire available water is then diverted into the Jones Ditch for another period of time, and finally is diverted into the Extension Ditch for a period of time. When the rotation system is in use, the water represented by Extension's senior priority of 5.5 c.f.s. has not been provided to Extension shareholders even when that right is in priority; rather, all the water actually available under that priority and under Consolidated's two senior priorities has been provided to Extension shareholders after the Consolidated shareholders have irrigated their lands. The precise operation of this plan has been mutually agreed upon by the two companies.

When water in excess of 100 c.f.s. is available at the Consolidated headgate, efforts are made to deliver water to all the shareholders of both companies at the

1. Extension also owns 200 shares of stock in the Highland Canal Company. These shares are not involved in this controversy.

2. The evidence admitted at trial indicated that neither the articles of incorporation nor the

bylaws of Extension or Consolidated provided for utilization of a rotation system; nor was any evidence of a written agreement for such a system introduced.

same time. When the supply of water at the headgate is between 49.8 c.f.s. and 100 c.f.s., the pattern of delivery has varied. In this latter situation, water has been delivered to shareholders of the companies under various distribution programs, including the rotation plan. Consolidated shareholders and Extension shareholders in effect exchanged water rights at times. The parties agree that when the flow is between 49.8 c.f.s. and 100 c.f.s., the objectors and the applicant shareholders actually receive more water than they would have received had the available water been distributed on a *pro rata* basis.

In 1973, Public Service Company (PSC) began to search for an appropriate location for development of a hydro-electric power plant in southeast Colorado. PSC determined that the water needed to operate the proposed 500 megawatt facility could be obtained by purchasing water rights from shareholders of Consolidated and Extension. Accordingly, in December of 1979 PSC selected a plant site in Bent County, Colorado, adjacent to the Extension ditch.

PSC then entered into an option contract with applicants, the selling shareholders of Consolidated and Extension (the Conexsel group).[3] The agreement basically provided that PSC would pay $1,300 per acre foot net yield of water available for PSC use. It further provided that the final decree of the water court would determine the available acre feet and that the option would be exercised provided such decree determined there was a dependable available annual yield of over 10,000 acre feet. If PSC were to exercise its option, the minimum payment due under the agreement would be in excess of $21,800,000, calculated as of June 1982.

Pursuant to the option contract, the Conexsel group and PSC filed an application in the district court for Water Division No. 2 seeking a change of water rights. The application, as amended, requested the following relief: (1) a change in type of use of the applicants' water rights to "agricultural, industrial (including the generation of electrical power and energy), domestic, municipal, recreational, and all other beneficial uses"; (2) a change in the place of use, *i.e.*, to the site of the proposed PSC facility; and (3) a change in the manner of use to direct application and storage.

■ On November 15, 1982, after an evidentiary hearing, the water court issued its "Findings of Fact, Conclusions of Law and Decree." The decree approved the application for change of water rights and permitted the applicants to implement such change "consistent with their respective contractual rights and obligations" and in accordance with the pertinent provisions of the decree. The decree, based upon a *pro rata* distribution formula adopted by the water court, authorized PSC to divert, for consumptive use, "the net water totally lost to the Arkansas River system" as a result of historic irrigation consumption. The decree is conditioned expressly upon the "drying up" of the acreage previously used for irrigation by the Conexsel group, and the water court reserved jurisdiction to consider the question of injury for five years after each shareholder in the Conexsel group has "dried up" the land which such shareholder had previously irrigated.[4] The objectors now appeal this decree.[5]

## II

The objectors initially argue that the water court erred in failing to make specific findings of the actual in-ditch distributions made under the junior priorities. They also assert that the water court further erred in failing to guarantee that the objectors would continue to receive more water than

---

3. The Conexsel group owns 430.33 shares in Consolidated and 660.25 shares in Extension, as well as various groundwater rights.

4. At trial, the parties agreed that 5,826 acres historically have been irrigated by the Conexsel group.

5. This court has direct appellate review jurisdiction of water court adjudications. *See* Colo. Const. art. VI, § 2(2); § 13–4–102(1)(d), 6 C.R.S. (1973); C.A.R. 1(a)(2).

their *pro rata* share would permit when flow conditions ranged from 49.8 to 100 c.f.s. We agree in part with the first argument and reject the second.

At trial, the objectors' expert witness, Duane Helton, testified concerning the allocations of water which, in his opinion, historically had been made to Extension shareholders. His conclusions were based almost exclusively upon his examination of certain documents reflecting information about water allocations at the Parshall flume located at the point of distribution to the Extension Ditch.[6] The Conexsel group's expert witness, Raymond Hogan, also testified concerning the question of historic use by Consolidated and Extension shareholders. He stated that the Parshall flume documents relied upon by Helton were incomplete, did not contain information concerning flow rates into the Extension ditch during drier years, could not be verified, and could not be interpreted correctly because of siltation in the stilling well. Concluding that these records were not reliable, Hogan based his opinions concerning historic use and appropriate future allocations of water under the proposed decree primarily upon interviews he conducted with officials and shareholders of Consolidated and Extension and with ditch riders familiar with the rotation system. Hogan did not attempt to segregate water delivered under junior and senior priorities. Instead, he described historic stream diversions on a ditch-wide basis, and determined the internal allocation of water on a decree-by-decree analysis based on the ownership of shares, without utilizing Extension's decreed junior priority of 44.8 c.f.s.

Hogan's analysis is reflected in a study he and others prepared for PSC in 1982, referred to as the "Wheeler Report." The Wheeler Report recites the historic practices, including rotation, that have characterized the system, and examines stream diversions and actual consumption by first calculating the gross diversions at the Consolidated Canal headgate and then determining "actual consumptive use" by factoring in conveyance losses, irrigation efficiency, return flow patterns and soil moisture content. The study indicates that during the sixteen-year period in question, the surface right diversions of Consolidated and Extension represented an annual average diversion from the Arkansas River of 24,-662 acre feet. The authors of the study assumed that the proper method of determining the historic consumptive use of water in the system was to allocate such use on the basis of the shareholders' *pro rata* ownership of water rights. Based on that assumption, the Conexsel group's historic *pro rata* share of the surface water rights was calculated to be equal to a total annual direct flow diversion of 19,986 acre feet.

Hogan testified that, on the basis of this assumption, the total average stream flow depletion from consumption and attendant irrigation losses associated with such diversion was 12,513 acre feet; that of the average annual Arkansas River diversion of 24,662 acre feet, 20,456 acre feet were diverted under the three senior priorities; and that the remaining 4,206 acre feet were diverted under the junior priorities. Hogan acknowledged that when water from the junior priorities was available at the headgate, Extension shareholders and the Conexsel group occasionally received water in excess of their actual *pro rata* share when the rotation plan was utilized.

In its final decree, the water court specifically adopted the findings of the Wheeler Report as its findings on historic use.[7] It

---

6. The records consist of documents containing notations, penned intermittently during the period 1966 through 1976, purportedly describing amounts of water passing through a flume. The flume in question is a seven-foot flume that measures the water passing from the Jones Ditch into the Extension Ditch. The capacity of this flume is between 50 and 60 c.f.s.

7. Paragraph 7.5 of the water court's findings states as follows:

The June 1982 report prepared by W.W. Wheeler and Associates, Inc., entitled "Las Animas Consolidated Water Supply Study" (hereinafter "Wheeler Report"), comprised a detailed analysis of the historic use of the water rights described in paragraphs 7.1. through 7.4. (hereinafter collectively referred

then referred to the conflicting opinions of the two expert witnesses as follows:

> The expert witnesses differed in their application of the stipulated facts in forming their respective opinions and the Court, after considering all of the testimony and exhibits, finds that Mr. Hogan's analysis is more persuasive than Mr. Helton's.

The water court concluded that

> the ownership of the Water Rights of the Consolidated and Extension Shareholders is to be determined by the pro·rata interest of each shareholder to the total number of outstanding shares in either of the mutual ditch companies.

It also concluded that implementation of the proposed change, if accomplished pursuant to the decree, would not injuriously affect those persons entitled to use such water.[8]

■ The objectors' argument that the decree does not include sufficiently detailed findings concerning historic use of the junior priorities is valid to a limited extent. The water court expressly adopted the Wheeler Report's conclusions concerning historic use of all the water in the system. The court also expressly rejected the analysis of historic use and stream flow diversion offered by Helton—the only evidence supporting objectors' position that precise measurement of the water received from the junior priorities is possible. Thus, the water court in essence found that the factual description of historic use contained in the Wheeler Report was accurate. This finding is supported by the evidence, and will not be disturbed on appeal. However, the water court's opinion does not indicate that the Wheeler Report was attached to and incorporated in the decree. Such incorporation is necessary to guide the resolution of future questions which may arise concerning the effect of the decree. On remand, the decree should be amended to indicate that the Wheeler Report is expressly incorporated into and made a physical part of the decree.

■ The objectors also argue that the water court erroneously permitted the determination of the historic use of the junior priorities to be calculated on the basis of the assumption that application of a formula of *pro rata* distribution was the appropriate method by which to determine such use. In essence, the objectors assert that the applicants failed to sustain their burden of demonstrating historic use because an assumption of *pro rata* distribution cannot replace evidence of actual consumption.

We reject this argument in the context of this case. The applicants did present reliable evidence of the various means by which all shareholders historically received water. Any inability to establish actual shareholder-by-shareholder consumption under the junior priorities resulted from the fact that no reliable records of such specific consumption are extant. Furthermore, it is not disputed that the objectors at all times actually received at least the amount of water their *pro rata* ownership interests under the junior priorities entitled them to receive. In these circumstances, we hold that the applicants were entitled to a presumption that water was historically used by the shareholders on the basis to which they were legally entitled to use such water. In this case, that basis is each shareholder's *pro rata* share of the water rights owned by the company. *See Great Western Sugar Co. v. Jackson Lake Reservoir & Irrigation Co.*, 681 P.2d 484 (Colo. 1984); *Jacobucci v. District Court*, 189 Colo. 380, 541 P.2d 667 (1975). Such evidentiary rule permits applicants who can demonstrate gross patterns of historic use of water rights to seek beneficial changes in such patterns of use which otherwise

to as the "Water Rights") and which is incorporated into these findings.

8. The water court decreed that:
   No owner of or person entitled to use water under a vested or decreed conditional water right in the Arkansas River or its tributaries

will be materially injured or injuriously affected by the granting of the change of water rights requested by the applicants provided that the conditions and limitations hereinabove set forth are implemented.

would be prohibited not because of demonstrable injury to the legal rights of others but because of the practical problem of the unavailability of reliable records. A shareholder asserting that historic use differed from use based on legal ownership may, of course, attempt to rebut the presumption.

In this case, the applicants satisfied their burden of establishing historic use of the junior priorities by relying on the presumption of *pro rata* consumption by the shareholders. The evidence relied upon by the objectors to rebut this presumption was rejected by the water court. Thus, the objectors' argument that applicants failed to establish historic use is not persuasive. Because we conclude that in this case historic use is measured by the shareholders' *pro rata* ownership interests, we need not speculate concerning issues which might arise in an application for a change of water rights if the evidence established that the historic use of water by mutual ditch company shareholders in fact differed from the use which would have occurred under the allocation of water on a *pro rata* share basis.

■ We also reject the objectors' assertion that the water court erred in failing to impose a water delivery pattern consistent with the rotational pattern utilized in the past as a condition of its final decree. The application for change in place and type of use filed by the Conexsel group and PSC constitutes an application for a "change of water rights." § 37–92–103(5), 15 C.R.S. (1973). Section 37–92–305(3), 15 C.R.S. (1973), which governs such proceedings, states in pertinent part as follows:

A change of water right ... shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or decreed conditional water right.

Under this statutory provision, applicants for a change of water rights have the burden of establishing the absence of injurious results from the proposed change. *Rominiecki v. McIntyre Livestock Corp.*, 633 P.2d 1064 (Colo.1981); *Weibert v.*

*Rothe Brothers, Inc.*, 200 Colo. 310, 618 P.2d 1367 (1980). *See Great Western Sugar v. Jackson Lake Reservoir & Irrigation Co.*, *supra.* However, once an applicant has made a *prima facie* showing that no injury will result from a proposed change in water rights, the burden of going forward with evidence of potential injury shifts to the objectors. *CF & I Steel Corp. v. Rooks*, 178 Colo. 110, 495 P.2d 1134 (1972); *Cline v. McDowell*, 132 Colo. 37, 284 P.2d 1056 (1955).

■ These principles are designed to reconcile the often divergent interests of persons seeking to change beneficial use of available water by altering existing patterns of distribution and persons entitled by virtue of vested ownership rights to protection from injurious interference with prior use of such rights. To accommodate such competing interests, water courts often find it necessary to impose prudential conditions upon any new program. Thus, if proposed conditions to a requested change of water right will serve to prevent injury to the vested rights of others, the change should be permitted under those conditions. § 37–92–305(3), 15 C.R.S. (1973); *Rominiecki v. McIntyre Livestock Corp.*, *supra.*

■ The General Assembly has encouraged such accommodation of competing interests in section 37–92–305(4), 15 C.R.S. (1973), which statute suggests the following types of conditions water courts may include in final decrees to prevent injury:

(a) A limitation on the use of the water which is subject to the change, taking into consideration the historic use and the flexibility required by annual climatic differences;

(b) The relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary to prevent an enlargement upon the historic use or dimi-

nution of return flow to the detriment of other appropriators;

(c) A time limitation on the diversion of water for which the change is sought in terms of months per year;

(d) Such other conditions as may be necessary to protect the vested rights of others.

Here, the water court sought to ensure that other users would not be injured by the requested change by including the following conditions in its decree: (1) the requirement that all lands formerly irrigated by the Conexsel group be taken out of the system, or "dried-up"; (2) the return to the Arkansas River of the "historic" return flow to ensure that objectors may "continue to call for water as they have historically"; (3) the guarantee to the objectors of their entire entitlement to surface water, based upon their *pro rata* share; and (4) the retention of jurisdiction for five years after the lands of the Conexsel group are "dried-up" to consider any questions of injury.

The plan ensures that the objectors will receive their *pro rata* share of available water by requiring the return of water to the system at appropriate points. As outlined in the plan approved by the water court, PSC would receive its *pro rata* allocation of water at the headgate. Its allotment would be diverted at a point just upstream of the flume which measures the flow from the Jones Ditch into the Extension Ditch. The plan provides for the potential return of water to the system at three separate points: (1) at the wasteway which is located downstream from the headgate, near the measuring flume for the Consolidated Ditch; (2) at a point on the Extension Ditch near the siphon under the Purgatoire River; and (3) at the end of the Extension Ditch, when it tails into the John Martin Reservoir. Measuring devices installed at each of these points will ensure that sufficient water passes through the system to provide all shareholders, including the opponents, with their *pro rata* share of available water.

The actual operation of the new system will be controlled by the boards of directors of the two companies, as in the past. PSC, through its representation on the boards as the majority shareholder in each company, will, of course, be able to direct the distribution of water throughout the system in dry years as well as in wet years. The record contains testimony that a rotation system might again be employed to ensure adequate supplies of available water to the objectors. However implemented in practice, the decree recognizes that the objectors are entitled to receive their *pro rata* share of available water under the junior priorities. The evidence does not establish any contractual or other right of the objectors to insist upon a particular method of delivering the water to which they are entitled. *See Brighton Ditch Co. v. City of Englewood,* 124 Colo. 366, 237 P.2d 116 (1951). We conclude that the conditions imposed by the water court in its decree adequately protect the objectors' interests in their water rights under the junior priorities against injury resulting from the requested change in water rights.

## III

■ The objectors finally contend that the water court erroneously assigned eighty-four acre feet as the amount of depletion associated with the dry-up of two parcels of land totalling ninety-nine acres because the evidence established that the shares associated with those parcels were never used to irrigate both parcels during the same irrigation season. The objectors did not present this argument to the water court during the hearing or in their motion to alter or amend judgment. The water court having been given no opportunity to correct the alleged error, the objectors may not now raise this new issue on appeal. C.R.C.P. 59(f). *See Massey v. People,* 656 P.2d 658 (Colo.1982); *Rowe v. Watered Down Farms,* 195 Colo. 152, 576 P.2d 172 (1978); *Furer v. Allied Steel Co.,* 174 Colo. 171, 483 P.2d 212 (1971).[9]

---

**9.** The objectors' motion to alter or amend did

assert as error the trial court's inclusion of land

The findings of fact, conclusions of law and decree of the water court are hereby affirmed, except that the case is remanded with directions to attach to the decree the Wheeler Report referred to in paragraph 7.5 thereof and to amend such paragraph to reflect such attachment.

owned by George Gruber in its calculation of the amount of water to be credited as a result of the dry-up requirement. Gruber has conveyed his land to a member of the Conexsel group, however, and has been dismissed as a party to this appeal. At oral argument, the objectors conceded that under these circumstances this issue is moot. Furthermore, at trial, the objectors themselves introduced an exhibit which indicated their agreement that 5,826 acres was the accurate figure representing the number of acres irrigated by the Conexsel group. They cannot now contest these essentially undisputed facts on appeal. *See Gurney v. Brown,* 32 Colo. 472, 77 P. 357, *aff'd* 201 U.S. 184, 26 S.Ct. 590, 50 L.Ed.2d 717 (1904).