**In the Matter of the Water Rights of John M. MAY, Frances M. May, and Rock Creek Canyon Corporation in Rock Creek and Rock Creek Alluvium in El Paso County.**

**John M. MAY, Frances May, and Rock Creek Canyon Corporation, Appellants/Cross–Appellees,**

**v.**

**UNITED STATES of America, Rock Creek Park Association, and Division Engineer, Appellees,**

**and**

**Rock Creek Mesa Water District, Appellee/Cross–Appellant.**

**No. 86SA129.**

Supreme Court of Colorado, En Banc.

May 9, 1988.

As Modified on Denial of Rehearing June 6, 1988.

Davis, Graham & Stubbs, Clyde O. Martz, Gail L. Wurtzler, Denver, for appellants/cross-appellees.

F. Henry Habicht II, Asst. Atty. Gen., Robert L. Klarquist, Dept. of Justice, Washington, D.C., Robert N. Miller, U.S. Atty., John R. Hill, Dept. of Justice, Land & Natural Resources Div., Denver, for appellee U.S. of America.

Sherman & Howard, Gary L. Greer, G. Sonny Cave, Denver, for appellee Rock Creek Park Assn.

Duane Woodard, Atty. Gen., Charles B. Howe, Deputy Atty. Gen., Richard H. Forman, Sol. Gen., Wendy C. Weiss, First Asst. Atty. Gen., Denver, for appellee State Div. Engineer.

Fischer, Brown, Huddleson & Gunn, P.C., Ward H. Fischer, Stephen J. Jouard, Fort Collins, Evans and Briggs, Paul V. Evans, G. Scott Briggs, Colorado Springs, for appellee/cross-appellant Rock Creek Mesa Water Dist.

ERICKSON, Justice.

Appellants John and Frances May and Rock Creek Canyon Corporation applied in Water Division No. 2 for a conditional decree for storage of 462 acre-feet of water in a basin hydraulically separate from Rock Creek, the source of supply, and, in conjunction with a proposed change in use of water rights and plan of augmentation, a determination under section 37–92–305, 15 C.R.S. (1973 & 1984 Supp.), that proposed alterations in the use of water in the separate basin would not impair vested rights in Rock Creek. Appellants proposed to use the water as (1) a domestic supply for a new subdivision on the May property; (2) a domestic supply of 75 acre-feet under a continuing contract for water service to the Rock Creek Mesa Water District (Mesa); and (3) a reserve of 50 acre-feet in storage for domestic and campground uses on the May property. Statements of opposition were filed by the United States and Rock Creek Park Association claiming that the proposed storage and use of water in the separate basin would alter the rate, timing, and quantity of diversions from Rock Creek. Mesa filed an objection asserting that the continuing water service contract provided for more water than the annual 75 acre-feet obligation that appellants recognized in their application.

In a pretrial order dated October 11, 1985, the District Court for Water Division Number 2 determined that the contract between the Mays and Mesa unambiguously obligated the Mays to provide only 75 acre-feet of water annually. After trial, the court issued an order determining historic diversions and the amount of water available under the Mays' water rights decrees and denying appellants' application for a change in use and a plan of augmentation since the proposed change in use would injure vested rights of other appropriators. Following the order, appellants proposed terms and conditions under section 37–92–305 to avoid injury to other appropriators. The trial court rejected the proposals finding that they were insufficient to prevent injury to other users. We affirm.

## I.

### *Factual Background*

The Mays own and operate a campground and recreational park in El Paso County, Colorado, west of the Fort Carson Military Reservation. The property consists of campgrounds, a museum and curio shop, a rally field, and five reservoirs used for fishing and swimming. They own the following water rights for commercial, recreational, piscatorial, municipal, irrigation, and domestic uses: (1) water rights decree to May well 1 for 1.9 cubic-feet-per-second (cfs); (2) water rights decree to May well 2 for 2.5 cfs; (3) water rights decree to May well 3 for 2.2 cfs; (4) water rights decree to the steer well for .103 cfs and for .033 cfs only for domestic uses; and (5) water storage rights decrees totalling 67.-647 acre-feet for the five reservoirs (includes conditional decrees for storage of 33.513 acre-feet). The May wells tap an alluvial formation that is hydraulically and hydrologically connected to the flow of Rock Creek, a naturally occurring stream. To irrigate 20 acres of land, the Mays also own six percent of the waters decreed to the Gale ditch. The headgate of the ditch is located on Rock Creek downstream of the steer well and upstream of the other decreed rights.

After a flood impaired the production of well 1 in 1970, the Mays applied for and received a permit to drill a replacement well with a maximum pumping rate of 850 gallons-per-minute (gpm) for domestic, livestock, commercial, industrial, irrigation, and recreational purposes. The permit was subject to the terms of the decree for well 1. In October 1980, the Mays drilled two replacement wells, wells 1A and 1B, to obtain the decreed withdrawal rate for well 1. On November 4, 1982, they filed statements of beneficial use for each well, claiming a 240–gpm pumping rate on well 1A and a 270–gpm pumping rate on well 1B. On the same day, they filed an affidavit, certifying that well 1 was plugged and abandoned. On October 11, 1984, they applied for a permit to drill a new well, well 1X, as an alternate and supplemental point of diversion under the decree for well 1.

The application requested a maximum pumping rate of 620 gpm to withdraw 400 acre-feet each year. The State Engineer never acted on the application.

The Mays diverted and distributed water for use through three systems—the general ranch system, the May ditch, and the Rock Creek Mesa system. The general ranch system furnishes water for the campgrounds, the museum and curio shop, and several residences for domestic purposes. The system is supplied primarily by wells 1A and 1B. The May ditch is supplied principally by wells 2 and 3 and at times by the Gale ditch and wells 1A and 1B. The May ditch flows through four of the May reservoirs for piscatorial purposes and provides water for irrigation and recreation. The Rock Creek Mesa system is largely supplied by a pipeline from well 3 and provides water to the Rock Creek Mesa Water District pursuant to a delivery contract. Waters diverted by the Mays are used in the Rock Creek basin and in an adjacent unnamed basin. The two basins are hydraulically separated by a subsurface barrier of shale, and return flows from diversions into the unnamed basin do not return to Rock Creek.

On August 7, 1984, Rock Creek Canyon Corporation purchased from the Mays approximately 200 acres of land in the Rock Creek and unnamed basins, all the decreed water rights of the Mays except for the rights decreed for well 1, and a right to purchase an undetermined amount of water under the well 1 decree. Appellants planned to use the water as (1) a domestic supply for a new subdivision on the May property; (2) a domestic supply of 75 acre-feet to satisfy contractual commitments to Mesa; and (3) a reserve of 50 acre-feet in storage for domestic and campground uses on the May property. To effectuate their plans, appellants filed an application on December 21, 1984, in Water Division Number 2 seeking: (1) absolute decrees for enlargements of May reservoirs 1 and 4; (2) a conditional decree for a new 462 acre-foot reservoir in the unnamed basin; (3) confirmation of a replacement well and an alternate and supplemental point of diversion

for the May well 1 decree; and (4) a determination by the water court that appellants are not required to provide augmentation water because no vested water right will be injured by the proposal.

Statements of opposition to the application were filed by Rock Creek Mesa Water District, the United States, the City of Colorado Springs, and Rock Creek Park Association on its own behalf and for numerous other appropriators from Rock Creek. Prior to trial, Colorado Springs withdrew its statement of opposition. In their statements, the United States and Rock Creek Park Association claimed that the proposed storage and use of water in the unnamed basin would alter the rate, timing, and quantity of diversions from Rock Creek. Mesa's objection asserted that its contract with the Mays entitled it to more water than the annual 75 acre-feet obligation that appellants recognized in their application.

*Resolution by the District Court*

Prior to trial, appellants filed a motion in limine for interpretation of their contract with Mesa. In a pre-trial order, the parties stipulated that the sole agreements between the Mays and Mesa were a water sales contract dated August 19, 1964, an addendum to the water sales contract dated October 25, 1976, and a first revision to the addendum dated June 2, 1982. By order dated October 11, 1985, the court determined as a matter of law that the agreements obligated the Mays to provide 75 acre-feet of water annually to Mesa and 12 million gallons of storage capacity.

The trial commenced in the District Court in and for Water Division No. 2 (water court) on November 5, 1985, and concluded on November 7, 1985. Based on the Mays' power consumption records for 1959, 1960, 1981, 1982, and 1983, and on the sustained yields of wells 1A and 1B, the water court determined the maximum pos-

sible historic use for well 1 to be 178 acre-feet. The court estimated the maximum historic use for well 2 to be 145 acre-feet and for well 3 to be 155 acre-feet based on the maximum yield of each well.[1]

With respect to the amount of water rights available to meet project demands, the court stated:

The total historic annual use proved by the Applicants is *less than* 178 acre-feet for Well No. 1 (Well No. 1A and 1B), 145 acre-feet for Well No. 2, and 155 acre-feet for Well No. 3. Those amounts, together with a 6% contribution from the Gale Ditch diversions [12.66 acre-feet], total *less than* 490.66 acre-feet. Of those diversions 40 acre-feet went into the campgrounds and domestic system, 21.94 acre-feet (average) went to the Rock Creek Mesa Water District, and 128 acre-feet was used for irrigation of the 35 acres of alfalfa. The May Ditch carried an annual average of 428.72 acre-feet of the diversions, of which 128 acre-feet was used for irrigation and 300.72 acre-feet *must* have been applied to continuous flow through the reservoirs for piscatorial purposes (257.85 acre-feet) and lost through seepage and evaporation (10% or 42.87 acre-feet). The Applicants have not proved that a continuous flow of 257.85 acre-feet per year, or approximately 0.36 cubic feet per second, is necessary for their piscatorial operation, and therefore a beneficial use.... [T]he historic beneficial use should be reduced from 257.85 acre-feet to 179 acre-feet. Thus, the total average annual diversions by the Applicants, which were applied to beneficial uses, were *less than* 411.81 acre-feet. Subtracting from that amount the amounts necessary for the continued campground and domestic uses (40 acre-feet), the amount obligated to Rock Creek Mesa Water District (75 acre-feet), and the Applicant's portion of

---

1. Well yield is the "maximum pumping rate that can be supplied by a well without lowering the water level in the well below the pump intake." R. Freeze & J. Cherry, *Groundwater* 305 (1979). Safe or sustained yield is the amount of water that can be withdrawn from a groundwater basin without producing undesired results including depletion of groundwater reserves, intrusion of water of undesirable quality, contravention of existing water rights, and deterioration of the economic advantages of pumping. *Id.* at 364; *see* A. Kashef, *Groundwater Engineering* 255 (1986).

the Gale Ditch to be used for irrigation of common area green belts in the proposed development (12.66 acre-feet), there remains less than 284.15 acre-feet available for the proposed project....

(Emphasis added.)

The water court determined that total annual demand for the proposed project was 384 acre-feet based on annual project requirements of 260 acre-feet for municipal and commercial use; 49 acre-feet of evaporation and seepage loss from the proposed reservoirs; and 75 acre-feet to meet contractual commitments to Mesa. Replacement requirements for the reservoirs were estimated not to exceed 334 acre-feet in any year. Assuming full depletion of the reservoir, the court concluded that the maximum requirement in any year would be 846 acre-feet, the aggregate of 384 acre-feet of annual demand and 462 acre-feet of reservoir storage.

Because the amount of water historically used by the Mays was insufficient to avoid injury to other appropriators, the court denied the proposed change in use and plan of augmentation and the conditional storage right for 462 acre-feet of water.[2] *Southeastern Colo. Water Conservancy Dist. v. City of Florence*, 688 P.2d 715 (Colo.1984); *Hallenbeck v. Granby Ditch & Reservoir Co.*, 160 Colo. 555, 420 P.2d 419 (1966); § 37–92–305(3), 15 C.R.S. (1973 & 1984 Supp.). The water court increased the Mays' existing storage rights by 8.463 acre-feet. The Mays' application for well 1X was approved, provided that the combined production from wells 1A and 1X is not in excess of 178 acre-feet in any year and that each well is used to supply only the general ranch system.

On February 19, 1986, the water court issued amended findings of fact, conclusions of law and decree. In the amendments to the original order, the court rejected terms and conditions proposed by the Mays under section 37–92–305 to avoid injury to other appropriators. The court also amended the findings of fact in the original order to reject the Mays' records of the flow in the May ditch since the records were not deemed credible.

II.

Mesa's cross-appeal challenges the trial court's finding that the Mays are only required to furnish Mesa with 75 acre-feet of water per year and provide storage capacity for 12 million gallons of water. The water sales contract dated August 19, 1964, between the Mays and Mesa contains the following provisions:

[I]t is agreed between the parties as follows:

1. That the Sellers [the Mays] hereby sell unto the Purchaser, water for domestic and municipal purposes to be diverted by the Purchaser [Mesa] from wells reservoirs and other structures located on premises owned by the Sellers, above described. Sellers agree to furnish to the Purchaser one-half of all the total available water supply produced from Sellers premises including one-half of all water that may hereafter be produced or obtained by means of development of wells, construction of reservoirs or the acquisition by the Sellers of additional surface priorities from Rock Creek.

....

6. [I]n determining the quantities of water which the Purchaser shall be entitled to demand hereunder, such supply shall be determined on the basis of the greatest annual amount of water delivered by the Sellers to the Purchaser during the calendar years, 1966, 1967 and 1968, and in no event shall the Sellers be required under the terms of this Contract to deliver any quantities of water exceeding twenty-five percent (25%) more than the quantity of water purchased in said highest use year, provided, however, that in the event that Sellers shall seek to sell additional quantities of water for use away from Sellers premises, Purchaser shall have the first right and option to purchase such additional water....

---

**2.** In computing the historic diversions from wells 1 (wells 1A and 1B), 2, and 3, the water court made no adjustment for the State Engineer's rules and regulations requiring pumping to be done only three days out of every seven.

. . . .

7. ... Seller shall construct facilities for the usable storage of nine million gallons of water within sixty (60) days after completion of the water distribution facility contract, provided, that in the computation of such usable storage capacity present storage facilities shall be considered a portion of such capacity. They shall further construct usable storage capacity for a total (including storage already constructed) of 12,000,000 gallons storage at the time there are a minimum of 150 separate residential users served by Purchaser, and usable storage capacity for a total of 50,000,000 gallons of water at the time there are a minimum of 350 residential users served by Purchaser; provided, however, that the Sellers have one hundred (100) days to complete said storage after the 350th user begins using water from the system of Purchasers.

In the 1976 addendum, the parties abrogated the limitation under paragraph 6 and made, *inter alia*, the following amendments to the water sales contract:

2. Except to the extent herein expressly modified, said original agreement will remain in full force and effect.

3. The District [Mesa] agrees to buy, and May agrees to sell, 70 acre feet of water per annum, as measured from the meter measuring the District's taking of water into the District system; provided, however, that in periods of low water availability, available supplies shall be divided one-fourth (¼) to May and three-fourths (¾) to the District, as measured from the lowest elevation point of District diversion.

. . . .

5. ... The division of priorities shall be changed to a ratio of 3:1 in favor of

the District; provided that the personal residences of May and the museum shall continue to be exempt from this limitation and entitled to absolute priority.

. . . .

9. It has been contemplated by the parties that the water needs of May, for his personal residences and businesses, *may be* reasonably projected to as much as 25 acre-feet of water per year, and that the water needs of the District, as presently developed, are 70 to 75 acre-feet per year, to which *may be* added a potential growth factor of about 10% per year. . . .

*In spite of any inference placed upon any other language of this Addendum, it is here clearly stated to be the intent of this Addendum to provide that the parties hereto will share the first 100–acre-feet of available water on a "1 to May, 3 to District" ratio. . . .*[3]

(Emphasis added.)

The water court determined "as a matter of law that the provisions of the contract are not ambiguous as to the obligation of [the Mays] to provide in excess of 75 acre-feet of water per year to [Mesa], nor as to storage capacity enlargement by [the Mays]."

Mesa claims that the amended provisions of the contract entitle it to receive the greater of 75 acre-feet or three-quarters of *all* water produced during periods of water shortage. In nonshortage periods, Mesa asserts that, subject to the absolute priority given to the Mays' personal residence and museum, it gets three-quarters, or at the least one-half, of *all* the water produced by the Mays. According to Mesa, the contractual language limits neither the Mays' delivery obligations to 70 or 75 acre-feet nor the required storage capacity to 12

---

**3.** In 1982, the parties revised the addendum and water sales contract by adding the following provision:

4. For and in consideration of the agreement herein contained, the District agrees to pay May at the rate of seventy cents ($0.70) per one thousand (1,000) gallons or a minimum sum of one thousand one hundred and fifty dollars ($1,150) per month, whichever is the greater amount. Said Minimum monthly

sum ($1,150) shall be paid whether its value in water be taken by the District or not.

At the rate of seventy cents per one thousand gallons, the minimum payment, $1,150, would provide 1,642,857 gallons. The minimum payment is therefore equivalent to 5 acre-feet of water each month, or 60 acre-feet per year. Payment for aggregate monthly sales greater than $1,150 is based on a cost of seventy cents per one thousand gallons.

million gallons. The Mays contend that Mesa is only entitled to receive 70 acre-feet of water. We agree with the water court.

■ The interpretation of a written contract is generally a question of law. *Pepcol Mfg. Co. v. Denver Union Corp.,* 687 P.2d 1310 (Colo.1984); *Union Rural Elec. Ass'n v. P.U.C.,* 661 P.2d 247 (Colo. 1983). It is axiomatic that a contract must be construed to ascertain and effectuate the mutual intent of the parties. *Pepcol Mfg. Co.,* 687 P.2d at 1314. The parties' intent is determined primarily from the language of the instrument itself and extraneous evidence of intent is only admissible where there is an ambiguity in the terms of the agreement. *Radiology Prof. Corp. v. Trinidad Area Health Ass'n,* 195 Colo. 253, 577 P.2d 748 (1978); *McNichols v. City and County of Denver,* 120 Colo. 380, 209 P.2d 910 (1949). Written contracts that are complete and free from ambiguity express the intention of the parties and will be enforced according to their plain language. *Radiology Prof. Corp.,* 195 Colo. at 256, 577 P.2d at 750; *American Mining Co. v. Himrod–Kimball Mines Co.,* 124 Colo. 186, 235 P.2d 804 (1951).

■ In determining whether the provisions of an agreement are ambiguous, "the instrument's language must be examined and construed in harmony with the plain and generally accepted meaning of the words employed, and reference must be made to all the provisions of the agreement." *Radiology Prof. Corp.,* 195 Colo. at 256, 577 P.2d at 750; *Christmas v. Cooley,* 158 Colo. 297, 406 P.2d 333 (1965). The fact that the parties have different opinions about the interpretation of the contract does not of itself create an ambiguity. *Radiology Prof. Corp.,* 195 Colo. at 256–57, 577 P.2d at 750; *Brunton v. International Trust Co.,* 114 Colo. 298, 164 P.2d 472 (1945).

■ After closely examining the amended water sales contract we agree with the water court that the instrument unambig-

uously requires the Mays to annually deliver no more than 75 acre-feet of water and to provide for no greater than 12 million gallons of storage. The provisions of the original sales agreement and the addendum unambiguously provide that the Mays are only required to deliver a limited quantity of water to Mesa and that the 1–to–3 appropriation ratio applies only during periods of low water availability and not to all waters owned by the Mays. Under paragraph 9 of the addendum, the clear intent of the parties is that the first 100 acre-feet of available water must be divided on a "1 to May, 3 to [Mesa]" ratio. Since the delivery obligation of the Mays is therefore fixed at 75 acre-feet, or less than 350 users, the required storage capacity is 12 million gallons under the clear language of paragraph 7 of the original agreement.[4]

The provisions relied on by Mesa, paragraph 1 of the original sales agreement and paragraph 9 of the addendum, do not demand a contrary interpretation. Since paragraph 9 of the addendum is a specific commitment concerning the amount of water sold under the contract, it has preference over the general language in paragraph 1. 4 S. Williston, *Williston on Contracts* § 619, at 743–45 (W. Jaeger ed. 1961 & 1987 Supp.). Paragraph 9 provides that additional water *may be* added to the fixed delivery requirement to reflect growth. In the context of the agreement, paragraph 9 uses the words "may be" permissively and does not require the fixed delivery obligation to be increased each year to reflect growth.

■ We also find that the Mays' interpretation of the agreement entitling Mesa to receive 70 acre-feet of water is unpersuasive. Although certain provisions of the addendum suggest a fixed delivery requirement of 70 acre-feet, the clear intent of the parties appearing in the principal entitlement clause, paragraph 9, must be given effect. *Las Animas Consol. Canal Co. v. Hinderlider,* 100 Colo. 508, 68 P.2d

4. The parties estimated in paragraph 9 of the addendum that each user outlet will require 200 gallons per day. The annual delivery requirement of 75 acre-feet is equivalent to 24,438,856 gallons of water. Based on the admitted facts, 75 acre-feet would supply approximately 335 users.

564 (1937); *see* 4 S. Williston, *supra* at § 624, at 822.

Accordingly, we affirm the water court's interpretation of the water sales agreement between the Mays and Mesa.

### III.

The Mays claim that the water court arbitrarily quantified the amount of water beneficially used to flow through the May reservoirs. On cross-examination, John May testified that a flow of .25 cfs through the May ditch was sufficient to sustain the fish in the reservoirs. Based on the testimony, the water court found that .25 cfs, or 179 acre-feet, was the maximum amount of water beneficially used to flow through the reservoirs and reduced the Mays' entitlement from 257.85 acre-feet, the estimated historic use, to 179 acre-feet.[5]

The Mays claim that the reduction of the actual historic use was arbitrary because (1) the water court did not determine the amount of water flow necessary for recreational uses; (2) the amount of water neces-

sary for piscatorial uses has no fixed and definable duty;[6] (3) objectors have not established a prima facie case that waste has occurred; and (4) the water court's determination that 179 acre-feet was the actual beneficial use was arbitrary.[7] We disagree.

A water right is a property right. *Weibert v. Rothe Bros., Inc.,* 200 Colo. 310, 618 P.2d 1367 (1980); *Green v. Chaffee Ditch Co.,* 150 Colo. 91, 371 P.2d 775 (1962). To alter the use of that right, an owner must apply for a change of water right. §§ 37–92–103(5), –302(1)(a), 15 C.R.S. (1973 & 1984 Supp.).[8] Before the water court may grant an application for a change of water right, the applicant must establish that the proposed change will not injuriously affect the vested rights of other water users. § 37–92–304(3), –305(3), 15 C.R.S. (1973 & 1984 Supp.); *see Orr v. Arapahoe Water and Sanitation Dist.,* 753 P.2d 1217 (Colo.1988); *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 272 P.2d 629 (1954).[9]

5.  During oral argument, the Mays stated that the only factual finding of the water court they are challenging is the finding that 179 acre-feet was the maximum historic use of water that flowed through the May reservoirs.

6.  "Duty of water" refers to "that measure of water, which, by careful management and use, without wastage, is reasonably required to be applied to any given tract of land for such period of time as may be adequate to produce therefrom a maximum amount of such crops as ordinarily are grown thereon." *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 584–85, 272 P.2d 629, 634, (1954). Duty "is not a hard and fast unit of measurement, but is variable according to conditions." *Id.* at 585, 272 P.2d at 634.

7.  The Mays argue that the historic use is presumed to be the beneficial use since state water officials were aware of the use and did not contest its beneficiality. They rely on *McLean v. Farmers' Highline Canal & Reservoir Co.,* 44 Colo. 184, 98 P. 16 (1908). This contention is without merit. The beneficiality of the use is not contested but only the quantification of the use. There is no evidence in the record that state water officials knew of the quantity of water used to flow through the May reservoirs. Moreover, appellants read *McLean* too broadly. In *McLean,* appropriators sought to enjoin the superintendent from division No. 1 from closing the headgates of their ditches. We concluded that the complaint failed to state a claim be-

cause public officials are presumed to act in conformity with governing statutes and because the plaintiffs had failed to allege any facts establishing that the superintendent had not acted in conformance with their official duties.

8.  Section 37–92–103(5) provides:

"Change of water right" means a change in the type, place, or time of use, a change in the point of diversion, a change from a fixed point of diversion to alternate or supplemental points of diversion, a change from alternate or supplemental points of diversion to a fixed point of diversion, a change in the means of diversion, a change in the place of storage, a change from direct application to storage and subsequent application, a change from storage and subsequent application to direct application, a change from a fixed place of storage to alternate places of storage, a change from alternate places of storage to a fixed place of storage, or any combination of such changes. The term "change of water right" includes changes of conditional water rights as well as changes of water rights.

9.  Section 37–92–305(3), 15 C.R.S. (1973), sets forth the standard by which an application seeking a change of water right must be evaluated:

A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons

Accordingly, an appropriator cannot change the use of a water right if the change increases the historical use to the detriment of other appropriators. *Danielson v. Kerbs Agric., Inc.*, 646 P.2d 363 (Colo.1982); *Weibert*, 200 Colo. at 317, 618 P.2d at 1371–72; *City of Westminster v. Church*, 167 Colo. 1, 445 P.2d 52 (1968); *Farmers Highline Canal & Reservoir Co.*, 129 Colo. at 580, 272 P.2d at 634; § 37–92–305(9), 15 C.R.S. (1984 Supp.).[10] Historic use is measured by the amount of water applied to a beneficial use and the amount of return flow. *Danielson*, 646 P.2d at 373; *Farmers Highline Canal & Reservoir Co.*, 129 Colo. at 585–86, 272 P.2d at 635; *see* Colo. Const. art. XVI, § 6.[11] The requirement of noninjury protects the vested rights of junior appropriators to the continuation of stream conditions existing at the time of their respective appropriations. *Orr*, 753 P.2d at 1222–23; *City of Westminster*, 167 Colo. at 11–12, 445 P.2d at 57. When an appropriator of a water right exercises his privilege to change a water right, he risks requantification based on the amount of water applied to a beneficial use. *Pueblo West Metro. Dist. v. Southeastern Colo. Water Conservancy Dist.*, 717 P.2d 955 (Colo.1986); *Danielson*, 646 P.2d at 373; § 37–92–305(3); *see* § 37–92–502(2), 15 C.R.S. (1984 Supp.) (division engineer shall or-

der discontinuance of any diversion to the extent water is not used beneficially); *see also Weibert*, 200 Colo. at 316, 618 P.2d at 1371 (owner of water right is not entitled to waste water).

The water court's quantification of the water beneficially used to flow through the May reservoirs is supported by the record and must be upheld on review. *Wagner v. Allen*, 688 P.2d 1102 (Colo. 1984); *Green v. Chaffee Ditch Co.*, 150 Colo. 91, 371 P.2d 775 (1962); *see Colorado River Water Conservation Dist. v. City and County of Denver*, 642 P.2d 510 (Colo. 1982); *Colorado River Water Conservation Dist. v. City and County of Denver*, 640 P.2d 1139 (Colo.1982). The court properly reduced the estimated historic use to reflect the beneficial use of water for piscatorial purposes since the Mays presented no credible evidence of the amount of water beneficially applied to recreational uses. The amount of water beneficially applied to piscatorial uses could be quantified in this case because John May himself estimated the amount of water necessary to sustain the fish in his reservoirs.

Under the circumstances, we uphold the water court's quantification of the water beneficially used by the Mays to flow through the May reservoirs.

---

entitled to use water under a vested water right or a decreed conditional water right. If it is determined that the proposed change or plan as presented in the application would cause such injurious effect, the referee or water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

10. Section 37–92–305(9), 15 C.R.S. (1984 Supp.), provides in relevant part:

   (a) No claim for a water right may be recognized or a decree therefor granted except to the extent that the waters have been diverted, stored, or otherwise captured, possessed, and controlled and have been applied to a beneficial use, but nothing in this section shall affect appropriations by the state of Colorado for minimum streamflows as described in section 37–92–103(4).

   (b) No claim for a conditional water right may be recognized or a decree therefor granted except to the extent that it is established that the waters can be and will be diverted,

stored, or otherwise captured, possessed, and controlled and will be beneficially used and that the project can and will be completed with diligence and within a reasonable time.

11. Section 37–92–103(4), 15 C.R.S. (1973), defines "beneficial use" as follows:

   "Beneficial use" is the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made and, without limiting the generality of the foregoing, includes the impoundment of water for recreational purposes, including fishery or wildlife. For the benefit and enjoyment of present and future generations, "beneficial use" shall also include the appropriation by the state of Colorado in the manner prescribed by law of such minimum flows between specific points or levels for and on natural streams and lakes as are required to preserve the natural environment to a reasonable degree.

## IV.

Having determined that the water court properly quantified amounts of water historically used by the Mays, we now review the denial of the Mays' application for a change of water right and plan of augmentation and for a conditional decree for a new 462 acre-foot reservoir.[12] Section 37–92–305 provides in relevant part:

(3) A change of water right or plan for augmentation, including water exchange project, shall be approved if such change or plan will not injuriously affect the owner of or persons entitled to use water under a vested water right or a decreed conditional water right. If it is determined that the proposed change or plan as presented in the application would cause such injurious effect, the referee or the water judge, as the case may be, shall afford the applicant or any person opposed to the application an opportunity to propose terms or conditions which would prevent such injurious effect.

(4) Terms and conditions to prevent injury as specified in subsection (3) of this section may include:

(a) A limitation on the use of the water which is subject to the change, taking into consideration the historic use and the flexibility required by annual climatic differences;

(b) The relinquishment of part of the decree for which the change is sought or the relinquishment of other decrees owned by the applicant which are used by the applicant in conjunction with the decree for which the change has been requested, if necessary to prevent an enlargement upon the historic use or diminution of return flow to the detriment of other appropriators;

(c) A time limitation on the diversion of water for which the change is sought in terms of months per year;

(d) Such other conditions as may be necessary to protect the vested rights of others.

Under section 37–92–305(3), after the water court determines that other appropriators will be injured, the court must either devise a plan to avoid injury to other appropriators, or, if injury is unavoidable, deny the petition. *CF & I Steel Corp. v. Rooks,* 178 Colo. 110, 495 P.2d 1134 (1972); *DeHerrera v. Manassa Land & Irrigation Co.,* 151 Colo. 528, 379 P.2d 405 (1963); *Means v. Pratt,* 138 Colo. 214, 331 P.2d 805 (1958); *Colorado Springs v. Yust,* 126 Colo. 289, 249 P.2d 151 (1952). The applicant has the burden to present a plan which will prevent or compensate injury to other appropriators. *Hallenbeck v. Granby Ditch & Reservoir Co.,* 144 Colo. 485, 357 P.2d 358 (1960); *Terliamis v. Cerise,* 133 Colo. 329, 295 P.2d 224 (1956); *see Weibert,* 200 Colo. at 316, 618 P.2d at 1371 (applicants and protestants must be given opportunity to propose terms and conditions to prevent injury to other appropriators).

In this case, the water court's factual finding that the proposed changes in the application would cause injury to other appropriators is supported by the record and must be upheld on review. *Ackerman v. City of Walsenburg,* 171 Colo. 304, 467 P.2d 267 (1970); *Means,* 138 Colo. at 220, 331 P.2d at 808 (1958); *Farmers Highline Canal & Reservoir Co. v. City of Golden,* 129 Colo. 575, 272 P.2d 629 (1954); *see* § 37–92–305(9) (claim of water right only recognized to extent waters have been applied to beneficial use); *see also Southeastern Colo. Water Conservancy Dist. v. City of Florence,* 688 P.2d 715 (Colo.1984) (conditional water decree only granted upon proof that water is available in sufficient quantities and will be diverted and that the project will be completed with diligence).

After the court found injury to other appropriators and denied the application, the Mays proposed the following terms and conditions pursuant to section 37–92–305(3):

1. The reservoir and municipal reserve requested by Applicants will be reduced to reflect the quantity of water

---

**12.** A conditional water right is the "right to perfect a water right with a certain priority upon the completion with reasonable diligence of the appropriation upon which such water right is to be based." § 37–92–103(6), 15 C.R.S. (1973).

the Court finds available for change of use without injury. That amount is believed to be the 802 acre-feet set forth in Amended Finding No. 42, which represents the amount of maximum annual historic diversions available to Rock Creek Canyon Corporation after other present demands are subtracted.

2. To the extent Rock Creek Canyon Corporation requires and diverts water in excess of the amount authorized for municipal use and storage in the new reservoir, it will protect the rights of the United States by releases to Rock Creek of treated effluent water meeting Department of Health standards in amounts equivalent to excess diversions at the times when such excess diversions are made, provided that Rock Creek is then administered on a non-futile call basis.

3. Applicants will protect Rock Creek Park Association water users from any adverse effect on their rights from Applicants' change by maintaining a reserve in the new reservoir of an amount of water required to meet those users' existing domestic uses. That water will be provided to Rock Creek Park residents to the extent their existing domestic wells, drilled or dug in accordance with the State Engineers' regulations and registered with the State Engineer, fail to provide water in quantities required for existing domestic uses.

In an order dated February 19, 1986, the water court rejected the proposals as insufficient to prevent injury because they were based on "an availability of 802 acre-feet, which is far in excess of the amount determined by the Court to be available." The court found that "[t]here are no conditions under which Applicants can be allowed to divert all the amounts proposed and still prevent injury to vested water rights."

The Mays contend that the court erred in not granting the application based on the proposed terms and conditions. According to the Mays, approval of the application was mandatory since the proposed terms and conditions prevent injury to other users by limiting diversions to amounts found by the water court to be available. We disagree.

In our view, the water court's finding that injury to other appropriators was unavoidable is supported by the record. Due to a lack of credible evidence, the water court was unable to quantify actual historic use and had to determine, based upon incomplete power consumption records for well number 1 and pump tests for wells 1A, 1B, 2, and 3, the *maximum* possible historic use for the Mays' wells. The inability to accurately quantify historic use prevented the court from granting the application subject to terms and conditions that would avoid injury to other appropriators. To grant the application based on the Mays' proposed terms and conditions would be tantamount to an enlargement of their rights and would place a heavy and serious burden on other appropriators.

Accordingly, we affirm the judgment of the water court.