793 F.Supp. 265 (1992)
FIRST FEDERAL SAVINGS AND LOAN ASSOCIATION OF FARGO, NORTH DAKOTA, Plaintiff,
and
The Resolution Trust Corporation, as Receiver for First Federal Savings and Loan Association of Fargo, North Dakota, Intervenor,
v.
TRANSAMERICA TITLE INSURANCE COMPANY, Defendant.
Civ. A. No. 90 N 1823.
United States District Court, D. Colorado.
June 8, 1992.
George W. Mueller, Burns, Wall, Smith & Mueller, P.C., Denver, Colo., for plaintiff.
Peter C. Dietze, Dietze, Davis & Porter, P.C., Boulder, Colo., for defendant.

MEMORANDUM OPINION AND ORDER
NOTTINGHAM, District Judge.
This matter was tried to the court beginning April 9, 1992, and ending the following day. Trial was held on plaintiff's claim for breach of contract against defendant, all other claims having been withdrawn. After review of the evidence and the applicable *266 law, I enter the following findings of fact and conclusions of law.
At the commencement of this action, Plaintiff First Federal Savings and Loan Association of Fargo, North Dakota ("First Federal") was a federally-chartered savings and loan association with offices located exclusively in the state of North Dakota. The Resolution Trust Corporation ("RTC") intervened in this action as receiver for First Federal and was substituted as plaintiff. Defendant Transamerica is a California corporation and does not have its principal place of business in Colorado. Plaintiff's complaint requests relief in excess of $50,000. This court has jurisdiction based upon diversity of citizenship. 28 U.S.C.A. § 1332 (West Supp.1991).

FINDINGS OF FACT
The dispute involves a medical office building located in La Plata County, Colorado, in the city of Durango. Most of the facts were undisputed. See Plaintiff's Ex. 15. The La Plata County Hospital District ("the district") wanted to build a medical office building on the property it owned adjacent to La Plata County Hospital (hereinafter referred to as "the property"). In 1979, the district constructed the foundation for the building, but did not erect the building.
In early October 1982, the district and two individuals formed a Colorado limited partnership known as the La Plata County Medical Associates, Ltd. ("the partnership") for purposes of completing the medical office building. On October 14, 1982, the district and the partnership entered into a written document hereinafter referred to as "the ground lease." Under the terms of the ground lease, the district agreed to lease the property to the partnership for a 99-year term, with annual rent of one dollar. Plaintiff's Ex. 1.
In 1983, the partnership constructed the medical office building. In October 1983, the partnership and the district entered into a master lease whereby the partnership agreed to lease the medical office building back to the district for a term of five years with monthly rent of approximately $35,000. The building was mostly complete by 1984.
Pursuant to a letter agreement dated February 22, 1984, Camelback Mortgage Corporation ("Camelback") agreed to loan the partnership $2,943,000, which would be used to retire the construction loan for the office building. Plaintiff's Ex. 2. The loan was evidenced by a promissory note and secured by a deed of trust on the ground lease. Plaintiff's Exs. 5, 6. On that same day, Camelback, which is in the business of selling loans, offered to sell the promissory note to First Federal. Plaintiff's Ex. 3. First Federal accepted Camelback's offer four days later.
On February 23, 1984, Camelback ordered a title commitment from Transamerica's agent in Durango, Colorado. Defendant's Ex. H. Transamerica later issued a title commitment, which was sent to both Camelback and First Federal on March 2, 1984. See Plaintiff's Ex. 4; Defendant's Exs. L, M. First Federal disbursed the funds to Camelback on March 15, 1984, and closing occurred the next day. Camelback assigned the deed of trust for the ground lease to First Federal, and the lease was recorded that day. Plaintiff's Ex. 7. Camelback endorsed the partnership's promissory note to First Federal, but continued to service the note for First Federal.
Transamerica issued the title insurance policy to First Federal on March 29, 1984. Plaintiff's Ex. 9. The policy provides that Transamerica will insure First Federal against loss or damage resulting from specified occurrences up to the policy limit of $2,943,000. Transamerica did not advise First Federal of any title defects concerning the ground lease. First Federal did not ask. First Federal would not have made the loan if it had known that the ground lease would be declared void.
From the beginning, the partnership had difficulty obtaining tenants for the medical office building. To attract tenants, the partnership offered substantial rent discounts. Despite these efforts, a significant amount of space remained vacant. In addition, the local economy took a turn for the *267 worse in 1985. Rent proceeds were insufficient to repay the loans and to pay building expenses. In February 1985, the partnership defaulted on the First Federal note. Although the partnership attempted to become current and to continue to pay the note, it was not successful. By letter dated September 26, 1985, First Federal formally demanded accelerated payment of the note. Plaintiff's Ex. 23.
In October 1985, United Bank of Durango, another creditor of the partnership, filed suit to collect upon another note made by the partnership. Plaintiff's Ex. 24 (copy of the complaint). To protect its interests, First Federal moved to intervene in that action. That motion was granted on December 10, 1985. Plaintiff's Ex. 25 (copy of the motion and court order). This began First Federal's involvement in lengthy state court litigation concerning the medical office building. The district filed a separate, related action requesting declaratory and injunctive relief, including a declaration that the master lease and partnership were void. Plaintiff's Ex. 27. The two actions were consolidated. On September 30, 1986, three individual taxpayers moved to intervene, asserting for the first time that the ground lease was void ab initio. On October 2, 1986, First Federal amended its counterclaim and crossclaims, and for the first time requested foreclosure of the deed of trust on the ground lease. Plaintiff's Ex. 28. The taxpayers' motion to intervene was granted on October 30, 1986. Various parties moved for summary judgment in the consolidated action.
On October 30, 1987, the court ruled on the summary judgment motions and declared that the ground lease was void on the ground that the district, a quasi-municipal organization, was not authorized to enter into the lease. Plaintiff's Ex. 12. Trial on the remaining issues began on November 16, 1987. On October 19, 1988, the court issued its findings on the remaining issues. Plaintiff's Ex. 15. The court dismissed all claims against the district, reserving the claim of unjust enrichment and the question of an equitable remedy. The court awarded judgment in favor of First Federal and against the remaining individual partners in the partnership. However, the individual partners had filed personal bankruptcies and were insolvent.
On March 6, 1989, a hearing was held on the equitable remedy. The court issued its order on November 22, 1989. The court found that the market value of the building had declined to $1,140,000 at the time of the hearing. As the equitable remedy, the court awarded First Federal $1,140,000 against the district, which could be satisfied at the district's option either by paying the judgment amount or by transferring title. Plaintiff's Ex. 17. After the district failed to do either, First Federal filed a motion for contempt on March 9, 1990. Plaintiff's Ex. 19.
On June 13, 1990, the court issued an order vesting title of the property in First Federal. Plaintiff's Ex. 21. As a result of this order, First Federal was granted a special warranty deed, which established title to the property, and a reciprocal cross-easement, which clarified ambiguities in the previous lease concerning access and parking privileges. Defendant's Exs. AA, BB. After those documents were recorded on October 8, 1991, First Federal's title to the property was vested. In June 1990, the adjacent hospital changed from an acute care facility to a rehabilitation center, which further impacted the medical building's ability to attract tenants. The RTC eventually sold the property on November 26, 1991 for $775,000. See Defendant's Ex. DD.
Several letters were exchanged between First Federal's attorneys, primarily Mr. George Mueller, and Transamerica's legal counsel, Mr. William Reed. In a letter dated May 27, 1987, First Federal gave Transamerica notice of its possible claim that the void ground lease constituted a title defect and informed Transamerica of the continuing state court litigation. Plaintiff's Ex. 10. Transamerica responded by letter dated June 3, 1987, indicating that it would investigate the matter. Plaintiff's Ex. 11. Mr. Reed testified on behalf of defendant concerning the interaction between First Federal and Transamerica after the notice letter. This was the only *268 oral testimony on this issue. Mr. Reed testified that after receiving notice of the litigation he told Mr. Mueller that Transamerica would not substitute counsel and that Mr. Mueller should proceed with the state court litigation. Mr. Reed testified that he had many phone conversations with Mr. Mueller concerning the progress of the litigation. Although Mr. Reed acknowledged that he did not formally tell Mr. Mueller that Transamerica was defending First Federal, Mr. Reed testified that it was his understanding that Mr. Mueller was defending the action on Transamerica's behalf.
In a letter dated November 3, 1987, First Federal notified Transamerica of the court's October 30, 1987, ruling that the ground lease was void. Plaintiff's Ex. 13. Transamerica responded by a letter dated December 31, 1987, in which it stated that it was reserving "all rights to decline any duty to defend or to pay any loss which might result from this matter." Plaintiff's Ex. 14. In a letter dated February 16, 1990, plaintiff requested payment of $2,943,000 for a loss under the policy plus approximately $145,000 in attorney fees. Plaintiff's Ex. 18. In a letter dated April 20, 1990, Transamerica reiterated its position that it was reserving its rights relative to the duty to defend. Plaintiff's Ex. 36. In a letter dated December 28, 1990, Transamerica enclosed a check which paid for the attorney fees incurred in the state court litigation after the notice of claim was filed. Defendant's Ex. Z. First Federal does not make a claim for any unpaid attorney fees incurred in the state court litigation. First Federal filed this complaint seeking to recover $2,943,000 plus interest under the note, minus rents received, settlement received, and the value of the equitable remedy.

CONCLUSIONS OF LAW
Although neither party addressed the issue, I find that Colorado law controls this action. The contract is silent on this issue. Under Colorado law in a contract action, the law to be applied is the law of the state that has the most significant relationship to the transaction and the parties. Wood Bros. Homes, Inc. v. Walker Adjustment Bureau, 198 Colo. 444, 601 P.2d 1369, 1372 (1979). In this case, the title policy was ordered from defendant's agent in Colorado. The subject matter of the contract is located in Colorado and the legal proceedings concerning title were conducted in Colorado. I therefore conclude that Colorado is the state with the most significant relationship to the transaction and the parties.
First Federal claims that Transamerica breached the title insurance agreement. The express terms of a contract are enforceable unless there is an ambiguity. In re May, 756 P.2d 362, 369 (Colo.1988). The pivotal provision of the contract is paragraph 7(a) which provides:
No claim shall arise or be maintainable under this policy (a) if the Company, after having received notice of an alleged defect, lien or encumbrance insured against hereunder, by litigation or otherwise, removes such defect, lien or encumbrance or establishes the title, or the lien of the insured mortgage, as insured, within a reasonable time after receipt of such notice.
First Federal did not explicitly argue that the provision was ambiguous, although it implicitly makes this argument through its reliance on Citicorp Savings of Illinois v. Stewart Title Guaranty Company, 840 F.2d 526 (7th Cir.1988), in which the majority found an identical title insurance provision to be ambiguous. I disagree with the majority in Citicorp and am persuaded by the dissent that paragraph 7(a) of the title policy is not ambiguous. Id. at 533 (Coffey, J., dissenting). The language of paragraph 7(a) plainly prohibits plaintiff's claim if Transamerica established title to the property within a reasonable time after it received notice.
First Federal argues that the Transamerica took no action with respect to the defect; therefore, section 7(a) is inapplicable. First Federal argues that it was First Federal's attorneys who established title to the property in the state court proceedings, not Transamerica. Transamerica argues *269 that First Federal's attorneys were acting as agents for Transamerica. Furthermore, title to the property was vested in First Federal within a reasonable amount of time. The application of section 7(a) depends upon resolution of two factual disputes: whether First Federal's attorneys were acting as agents for Transamerica in the state court litigation, and, if so, whether First Federal's title to the property was established within a reasonable time.
First Federal notified Transamerica of its claim in a letter dated May 27, 1987. Plaintiff's Ex. 10. In later letters, Transamerica informed First Federal that it reserved the right to decline any duty to defend or any duty to pay under the policy. Plaintiff's Exs. 14, 36. First Federal argues that Transamerica's reservation of rights was in effect a denial of the duty to defend. First Federal points to the absence of any correspondence acknowledging a duty to defend. I disagree with First Federal's interpretation of the facts. According to the undisputed testimony of Mr. Reed, he told Mr. Mueller that Transamerica would not substitute counsel and that Mr. Mueller should proceed with the state court litigation. In a letter to Mr. Mueller dated December 31, 1987, Mr. Reed states that Transamerica "has engaged outside counsel to assist Transamerica and you in analyzing and carrying the litigation forward." Ex. 14 (emphasis added). That letter also thanks Mr. Mueller for keeping Transamerica informed of the progress of the litigation and for providing copies of the pleadings. I do not believe that First Federal's lawyers would keep Transamerica informed of the progress of the litigation if they did not believe that Transamerica was assuming some responsibility for the defense, albeit conditional; after all, it is to his principal, not some potentially-adverse third party, that an agent owes a duty to furnish information. See Restatement (Second) of Agency § 381 (1958). Although there was no formal letter confirming the relationship, I believe Mr. Reed's testimony that First Federal's lawyers were defending the action for Transamerica. Transamerica's direct payment of legal fees to counsel acting for First Federal further suggests that counsel was also acting for Transamerica.
It is settled law that an insurance company may reserve its right to deny coverage under the policy without breaching its duty to defend. Insurance Corp. of Ireland v. Bd. of Trustees of S. Ill., 937 F.2d 331, 337 (7th Cir.1991); Rhodes v. Chicago Ins. Co., 719 F.2d 116, 120 (5th Cir.1983). An insurance company may also reserve its right to deny its duty to defend and later recover for any attorney fees paid. See Walbrook Ins. Co. v. Goshgarian & Goshgarian, 726 F.Supp. 777, 781-82 (C.D.Cal.1989); Omaha Indem. Ins. Co. v. Cardon Oil Co., 687 F.Supp. 502, 505 (N.D.Cal.1988), aff'd 902 F.2d 40 (9th Cir. 1990). First Federal could have objected to Transamerica's reservation of rights, but it did not. I reject First Federal's argument that Transamerica's reservation of rights was a denial of its duty to defend. I conclude that First Federal's attorneys were acting as agents for Transamerica in the state court litigation. When First Federal's attorneys obtained title to the property, they did so as agents for Transamerica.
There simply is no evidence that the state court litigation took an unreasonable amount of time. I find that Transamerica established title to the property within a reasonable time after it received notice of the claim. Pursuant to section 7(a) of the policy, plaintiff has no claim under the policy. I therefore conclude that Transamerica did not breach the title insurance contract by failing to pay such a claim.
Throughout this litigation, plaintiff has relied on Citicorp Savings of Illinois v. Stewart Title Guaranty Company, 840 F.2d 526 (7th Cir.1988), which involves similar facts. In Citicorp, the purchaser of property brought a breach of contract action against the title insurer. After the title insurance policy was issued, plaintiff discovered that the seller had been adjudicated incompetent several years before the sale. The insurer tendered the deed to the purchaser in lieu of damages. In deciding the cross-motions for summary judgment, the court held that the insurer breached the policy's guarantee of the mortgage's enforceability *270 and was entitled to damages. The court concluded that the contract was breached at the time of issuance because the mortgage lien was unenforceable at that time. This reasoning ignores the nature of title insurance.
A title insurance policy does not guarantee title or the enforceability of a mortgage lien, but is instead a contract of indemnity. A title insurance company agrees to indemnify the insured from any loss or damage resulting from title defects. Trigiani v. American Title Ins. Co., 392 Pa.Super. 427, 573 A.2d 230, 231 (1990); Blackhawk Production Credit Ass'n v. Chicago Title Ins. Co., 144 Wis.2d 68, 423 N.W.2d 521, 524 (1988). When a defect occurs which is covered under the policy, the title insurance company is obligated to pay for the resulting loss or damage. The contract is breached only if the insurer does not pay for the loss or damage under the terms of the contract. Thus, the contract cannot be breached until after the insured makes a claim for loss and the insurer refuses to pay. I conclude that Transamerica could not have breached the policy until after First Federal gave notice of the claim. Because Transamerica established title to the property pursuant to paragraph 7(a) of the policy, there was no breach of contract. Upon the foregoing findings and conclusions, I resolve the issues in favor of Defendant Transamerica and against plaintiff. It is therefore
ORDERED that the clerk enter judgment in favor of defendant and against plaintiff. Defendant shall have its costs, to be awarded upon its filing of a bill of costs within eleven (11) days from the date of this order.