2016 CO 17

CONCERNING THE APPLICATION FOR WATER RIGHTS OF COUNTY OF BOULDER IN BOULDER COUNTY

County of Boulder, a body corporate and politic, Applicant–Appellant,

v.

BOULDER AND WELD COUNTY DITCH COMPANY, Water Users Association of District No. 6, The Farmers Reservoir and Irrigation Company, City of Boulder, Town of Erie, and City of Lafayette, Opposers–Appellees,

and

State Engineer and Division Engineer for Water Division No. 1., Appellees.

Supreme Court Case No. 14SA348

Supreme Court of Colorado.

March 21, 2016

Rehearing Denied April 11, 2016

Attorneys for Applicant–Appellant: Gilbert Y. Marchand, Jr., P.C., Gilbert Y. Marchand, Jr., Boulder, Colorado.

Attorneys for Opposer–Appellee Boulder and Weld County Ditch Company: PC Johnson Attorney at Law, LLC, Peter C. Johnson, Denver, Colorado.

JUSTICE HOOD delivered the Opinion of the Court.

¶ 1 Boulder County is developing a property known as the Bailey Farm into a public open-space park which will feature several ponds formed when abandoned gravel pits filled with groundwater. Because two of the pits-turned-ponds exposed groundwater after January 1, 1981, the County must replace out-of-priority stream depletions caused by evaporation from those ponds. See § 37–90–137(11)(a)-(b), C.R.S. (2015). To meet this obligation, the County filed an application for underground water rights, approval of a plan for augmentation, a change of water rights, and an appropriative right of substitution and exchange. The water court dismissed the application without prejudice, and the County now appeals that judgment.

¶ 2 The components of the County's application were interdependent, such that approval of the application as a whole hinged on approval of the plan for augmentation, which in turn hinged on approval of the change of water rights. The change of water rights involved the Martha M. Matthews Ditch water right ("MM water right"). The County sought to change the use of 50 inches of the MM water right historically used to irrigate the Bailey Farm ("Bailey Farm Inches") from irrigation to augmentation. To ensure this change would not unlawfully expand the Bailey Farm Inches, the County conducted a parcel-specific historical consumptive use ("HCU") analysis of that right.

¶ 3 The water court found this HCU analysis inadequate for several reasons and therefore concluded that the County failed to carry its burden of accurately demonstrating HCU. Because the County could not show an absence of injury to other water users without a reliable HCU analysis, the water court denied the change of use of the Bailey Farm

Inches. The water court then dismissed the County's application without prejudice.

¶ 4 The pivotal consideration in this case is whether the County carried its burden of proving HCU. Like the water court, we conclude it did not. We therefore affirm the water court's judgment on that basis.

## I. Facts and Procedural History

¶ 5 The Martha M. Matthews Ditch ("MM Ditch") was an approximately one-mile-long conduit situated south of and roughly parallel to Boulder Creek.[1] The ditch took water from a headgate on a south-reaching branch of Boulder Creek and carried it in a northeasterly direction. The MM Ditch was completed sometime before June 1, 1861; however, Martha Matthews did not own land near the ditch until 1871, when she purchased 160 acres in that area.

¶ 6 In 1881, Ms. Matthews petitioned the Boulder County District Court for the adjudication of water rights for the MM Ditch. After conducting a hearing to establish the water right, a referee entered findings that the MM Ditch was capable of carrying 4.6 cubic feet of water per second ("cfs") and that the water would be used to irrigate 120 acres lying below the ditch. In 1882, the district court granted Ms. Matthews a decree authorizing diversion of 4.6 cfs from Boulder Creek for the irrigation of 120 acres, with a priority date of June 1, 1861. Neither the referee's findings nor the decree identified the location of the 120 acres to be irrigated with the MM water right.

¶ 7 Although Ms. Matthews owned 160 acres near the MM Ditch when the 1882 decree entered, only 47 of those acres lay downslope of the ditch—i.e., between the ditch and Boulder Creek. The rest of her land was located either on the opposite side of Boulder Creek or above the elevation of the ditch. See Appendix. However, there

---

1. Attached as an appendix ("Appendix") to this opinion is a map depicting the lands, ditches, and watercourses involved in this case. The County presented this map as an illustrative exhibit at oral argument. The Appendix includes two demarcations for the MM Ditch: one is from the description in the 1882 decree for the MM water right and is represented by asterisks; the other is from an 1864 Bureau of Land Management survey and is represented by a dashed line. As we note below, the precise location of the MM Ditch cannot be determined because the ditch no longer exists. Any uncertainty as to which of these demarcations is accurate does not affect our decision here.

were approximately 240 additional irrigable acres lying under the MM Ditch that were not owned by Ms. Matthews.

¶ 8 In 1903, Ms. Matthews contracted with Boulder and Weld County Ditch Company ("BW Ditch Co.")—a mutual ditch company that operates the Boulder and Weld County Ditch ("BW Ditch") and delivers the BW Ditch water right to its shareholders—to carry 2.5 cfs of her water right through the BW Ditch to another downstream water user.[2]

¶ 9 In 1907, Ms. Matthews sued BW Ditch Co., alleging the company was interfering with her right to divert the MM water right through the company's headgate. The original point of diversion for the MM Ditch had been destroyed by a flood in 1875, and, pursuant to an agreement with BW Ditch Co., the MM water right had been diverted through the BW Ditch headgate since that time.[3] The court found in favor of Ms. Matthews and issued a decree authorizing her to change her point of diversion to the BW Ditch headgate and to carry her water a short distance through the BW Ditch to a point where the water would be transferred into the MM Ditch. The decree referred to this short stretch of BW Ditch as the "cutoff ditch."

¶ 10 Every year since 1907, the entire 4.6 cfs of the MM water right has been diverted at the BW Ditch headgate. At some point, however, the MM Ditch ceased being used, and the MM water right was instead diverted at headgates located farther down the BW Ditch, past the cutoff ditch portion. The MM Ditch is no longer visible on the ground.

¶ 11 Over time, the MM water right was divided and transferred to other owners in fractional interests described in inches rather than cfs. The parties agree that the 4.6 cfs MM water right amounts to 185 inches.

Presently, the County owns 100 inches (the 50 Bailey Farm Inches, plus 50 inches associated with the Alexander Dawson Farm); the Sandlin Farm owns 50 inches; and the Anderson South Farm owns the remaining 35 inches.[4]

¶ 12 Through a series of transactions in the early 1990s, the County acquired the Bailey Farm and, with it, the Bailey Farm Inches and a half-share of the BW Ditch water right.[5] The Bailey Farm is a 290-acre property that encompasses the location of the MM Ditch and much of the 160 acres of land originally owned by Ms. Matthews. The entirety of the Bailey Farm lies north, and downslope, of the BW Ditch. *See* Appendix. After the MM Ditch ceased being used, water used on the Bailey Farm was diverted from a headgate on the BW Ditch (the "Bailey Farm headgate"). Historical land uses on the Bailey Farm consisted of irrigated agriculture and, later, gravel mining.

¶ 13 The County is developing the Bailey Farm into a public open-space park which will feature several ponds formed when abandoned gravel pits filled with groundwater. Two of the pits-turned-ponds exposed groundwater after January 1, 1981, and the County therefore must obtain approval of a plan for augmentation to replace out-of-priority stream depletions caused by evaporation from those ponds. *See* § 37–90–137(11)(a)-(b).

¶ 14 In December 2010, the County filed an application in the District Court for Water Division No. 1 seeking to fulfill its replacement obligation.[6] In addition to underground water rights for the two ponds, the County sought approval of a plan for augmentation to replace the evaporation depletions with the Bailey Farm Inches and, when needed, water leased from the City of Lafayette. To secure these replacement supplies,

---

2. The copy of the agreement presented at trial was not signed. However, the agreement contained a notation that it was executed, and it was officially recorded in 1911.

3. The water court found there was no evidence presented to confirm that Ms. Matthews began diverting the MM water right at the BW Ditch headgate prior to 1903 (the year of the contract). However, the 1907 decree states that this practice began "about the year 1875."

4. The location of each of these properties is shown in the Appendix.

5. The 59.3–cfs BW Ditch water right is divided into a total of twenty shares.

6. The County amended its application in May 2013.

the County sought to change the use of the Bailey Farm Inches from irrigation to augmentation and sought an appropriative right of substitution and exchange to use the leased water when the changed Bailey Farm Inches proved insufficient. BW Ditch Co. opposed the County's application, claiming injury in connection with the County's requested change of use.[7]

¶ 15 At trial, the County submitted a parcel-specific HCU analysis for the Bailey Farm Inches using a study period of 1950 to 2000. The first version of that analysis estimated the amount of water delivered to the Bailey Farm using a proration formula based on diversions of the entire MM water right at the BW Ditch headgate. Because all 185 inches of the MM water right were diverted each year from 1950 to 2000, the analysis assumed delivery of the full 50 Bailey Farm Inches at the Bailey Farm headgate for the entire study period, less 20-percent ditch loss. Subsequently, the County obtained BW Ditch Co. records of actual water deliveries to the Bailey Farm headgate from 1973 to 2000; these records showed that the County's proration formula overestimated the amount of water delivered during that twenty-seven-year period by 37 percent. The County then revised its HCU analysis to reflect the actual deliveries from 1973 to 2000 and reached a lower HCU quantification. However, the County did not reduce its prorated estimates for the years 1950 to 1972.

¶ 16 The County's analysis also accounted for the half-share of BW Ditch water appurtenant to the Bailey Farm by assuming that water was used only when the irrigation water demand on the Bailey Farm was not fully satisfied by the Bailey Farm Inches. The County adopted this methodology because the Bailey Farm Inches are senior to the BW Ditch half-share.

¶ 17 The analysis was based on an assumption that the Bailey Farm Inches were historically used to irrigate 101 acres on the Bailey Farm. The claimed 101 acres consisted of two parcels—one approximately 31 acres in size,[8] the other approximately 70 acres in size. The 31-acre parcel is located within the area downslope of the MM Ditch; the 70-acre parcel is located upslope, and to the east, of that ditch. See Appendix. The County based its claimed acreage figure on six aerial photographs of the Bailey Farm taken between 1949 and 1973—which show the 31-acre and 70-acre parcels in irrigation—and on interviews with neighboring landowners and a former BW Ditch Co. ditch rider.

¶ 18 BW Ditch Co. argued that the County overstated the number of acres historically irrigated with the Bailey Farm Inches and asserted that using the County's HCU calculation for the change of use would lead to an expansion of the Bailey Farm Inches and cause injury to other water users farther down the BW Ditch. The BW Ditch is a large structure that carries the MM water right, the 59.3-cfs BW Ditch water right, and several others. The company claimed the County could not ignore historical use of the remaining 135 inches of the MM water right on the Dawson, Sandlin, and Anderson South Farms ("Other Farms")[9] and pointed out that a water court decree confirming historical use of the Bailey Farm Inches on 101 acres would leave the Other Farms with only 19 acres among them.[10] The County responded that it did not have to consider use on the Other Farms because, in its view, the Other Farms are outside the lawful place of use of the MM water right. It maintained that the claimed 101 acres, on the other hand, are within the lawful place of use of that right.[11]

7. Eight additional parties filed statements of opposition to the County's application; however, all of these parties either withdrew their opposition or reached an agreement with the County before trial.

8. This 31 acres actually was divided into two adjacent parcels separated by a thin strip of non-irrigated land. See Appendix. But for ease of understanding, we refer to these two parcels as one.

9. Like the Bailey Farm, the Other Farms own shares of BW Ditch water as well as MM water.

10. The land areas of the Dawson, Sandlin, and Anderson South Farms are 70 acres, 231 acres, and 109 acres, respectively.

11. Recognizing that its bid to change the Bailey Farm Inches necessarily would affect its 50 Dawson Farm inches, the County proposed to reduce

¶ 19 After the trial, the water court issued a written decision. The water court perceived several fatal flaws in the County's HCU analysis: first, the County inaccurately calculated the amount of water used pursuant to the Bailey Farm Inches; second, the County failed to prove that the 70–acre parcel, which comprised over two-thirds of the County's claimed acreage, was historically irrigated with the Bailey Farm Inches; and third, the County ignored historical use of the remaining portions of the MM water right on the Other Farms and should have conducted a ditchwide HCU analysis instead of a parcel-specific one.

¶ 20 In light of these flaws, the water court rejected the County's HCU analysis and concluded that the County had failed to carry its burden of proving HCU. The water court determined that the County could not carry its primary burden of showing the absence of injury to other water users without an accurate HCU analysis, and the court therefore denied the change of use of the Bailey Farm Inches. Next, the water court considered the County's requested appropriative right of substitution and exchange, which would have allowed the County to use water leased from the City of Lafayette as an additional source of replacement water for its augmentation plan. The court concluded that the County had not established that the water from the exchange was sufficient, without the changed Bailey Farm Inches, to satisfy the County's replacement obligations ·on a year-round basis. Thus, because the court had rejected the change, it also rejected the exchange. Having disapproved of the only proposed replacement water supplies for the County's plan for augmentation, the water court dismissed the County's application without prejudice.

¶ 21 The County appealed pursuant to section 13–4–102(1)(d), C.R.S. (2015), and C.A.R. 1(a)(2).[12]

the amount of land irrigated with the Dawson Farm inches to approximately 7 acres.

12. The County presented the following issues for review:
 1. Whether the District Court for Water Division No. 1 ("Water Court") erred as a matter of law in interpreting the place of

## II. Standard of Review

■ ¶ 22 "We review the water court's legal conclusions, including its interpretation of prior decrees, de novo." *Widefield Water & Sanitation Dist. v. Witte*, 2014 CO 81, ¶ 9, 340 P.3d 1118, 1122. We defer to the water court's factual findings if evidence in the record supports them. *Burlington Ditch Reservoir & Land Co. v. Metro Wastewater Reclamation Dist.*, 256 P.3d 645, 660 (Colo. 2011). The sufficiency, weight, and probative effect of the evidence before the water court, together with the inferences to be drawn from that evidence, are for the water court's determination. *Buffalo Park Dev. Co. v. Mountain Mut. Reservoir Co.*, 195 P.3d 674, 683 (Colo. 2008). "We will not disturb these determinations unless they are so clearly erroneous as to find no support in the record." *Id.*

## III. Analysis

¶ 23 Although the County's application included several separate requests, the requests were interdependent and the water court's dismissal of the application as a whole turned on its denial of the change of use of the Bailey Farm Inches. We therefore focus primarily on the water court's decision concerning change of use. The County claims the water court's decision to deny the change of use was premised on errors regarding lawful place of use and the sufficiency of a parcel-specific HCU analysis. The County maintains that it carried its burden of proving HCU and that we should reverse the water court's contrary conclusion. We disagree.

¶ 24 We begin by discussing the principles of Colorado water law applicable here. Those principles establish that the pivotal consideration in this case is whether the County carried its burden of proving HCU. We agree with the water court that the

 use contemplated by the 1882 and 1907 Decrees for the Martha M. Matthews water right?
 2. Whether there is any support in the record or at law for the Water Court's rejection of the County's parcel-specific historical consumptive use ("HCU") analysis?

County failed to carry its burden. We conclude that this failure of proof mandated denial of the change of use of the Bailey Farm Inches and dismissal of the County's application. We therefore affirm the water court's judgment on that basis.

### A. HCU Is Dispositive

¶ 25 To understand why the County's application lives or dies with its HCU analysis, it is necessary to understand the broader legal framework governing water use in Colorado. We therefore begin our analysis by reviewing the relevant areas of Colorado water law, starting at the broadest point and proceeding in successively narrower steps until we arrive at HCU.

### 1. Prior Appropriation and Augmentation Plans

¶ 26 The doctrine of prior appropriation is embedded in the Colorado Constitution and forms the foundation of Colorado water law. *See* Colo. Const. art. XVI, §§ 5–6; Gregory J. Hobbs, Jr., *Colorado Water Law: An Historical Overview*, 1 U. Denv. Water L.Rev. 1, 2–7 (1997). "Prior appropriation water law is a property rights-based allocation and administration system that promotes multiple use of a finite resource for beneficial purposes." *Empire Lodge Homeowners' Ass'n v. Moyer*, 39 P.3d 1139, 1146 (Colo. 2001). Under this system, "[t]he first user to place previously unappropriated water to beneficial use enjoy[s] a vested water right in the beneficial use of that water, thus giving that senior appropriator priority in use over all subsequent (and therefore junior) appropriators." *Gallegos v. Colo. Ground Water Comm'n*, 147 P.3d 20, 27 (Colo. 2006). Water rights are created by appropriation, confirmed and assigned priority dates through adjudication, and enforced according to those priority dates through administration. *Empire Lodge*, 39 P.3d at 1147–49.

¶ 27 The prior appropriation system developed early in Colorado's history, when water was taken primarily from surface streams and the interaction between surface water and groundwater was not well understood. *See* Hobbs, Jr., *supra*, at 20–21. As a result, even as groundwater use became widespread in the 1940s, such use went largely unregulated. *See id.* By the 1960s, however, many of Colorado's river systems were reaching an overappropriated status, and it became apparent that increasing junior diversions of tributary groundwater[13] were in some areas intercepting water needed to satisfy senior surface water rights. *See Empire Lodge*, 39 P.3d at 1149–50. These junior diversions included not only the pumping of tributary groundwater through wells, *id.* at 1150, but also, as in this case, the exposure and evaporation of tributary groundwater in connection with open-pit sand and gravel mining operations, *see Cent. Colo. Water Conservancy Dist. v. Simpson*, 877 P.2d 335, 339–40 (Colo. 1994).

¶ 28 The legislature saw value in these newer water uses and knew that strict application of the prior appropriation doctrine would impede them significantly; however, it also recognized the imperative need to protect vested surface rights. *See Empire Lodge*, 39 P.3d at 1150. To reconcile these competing interests, the legislature enacted the Water Right Determination and Administration Act of 1969, §§ 37–92–101 to –602, C.R.S. (2015), the stated purpose of which was "to integrate the appropriation, use and administration of [tributary groundwater] with the use of surface water, in such a way as to maximize the beneficial use of all of the waters of this state." *Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 60 (Colo. 2003) (citation omitted). Thus, while this act reinforced senior water uses by mandating adjudication and priority administration of junior tributary groundwater uses, *see* § 37–92–102; *Gallegos*, 147 P.3d at 28, it also created several mechanisms designed to facilitate new uses of overappropriated water resources,

---

**13.** Tributary groundwater is groundwater that is "hydraulically connected to the surface waters of a stream." *Colo. Ground Water Comm'n v. N. Kiowa–Bijou Groundwater Mgmt. Dist.*, 77 P.3d 62, 69–70 (Colo. 2003). Because of its connection to surface water, use of tributary groundwater "may reduce available surface water that decreed appropriators would otherwise be able to divert in order of priority." *Id.* at 70.

*see* § 37–92–305(3)(a); *Empire Lodge*, 39 P.3d at 1150.

¶ 29 Plans for augmentation are one of these statutory mechanisms.[14] *Upper Eagle Reg'l Water Auth. v. Wolfe*, 230 P.3d 1203, 1210 (Colo. 2010). "Augmentation plans allow users to divert water out of priority, from any legally available source of water, so long as the user replenishes its out-of-priority diversion using other existing water rights—ensuring the protection of senior water rights." *Wolfe v. Sedalia Water & Sanitation Dist.*, 2015 CO 8, ¶ 24, 343 P.3d 16, 24. If an augmentation plan will not injure other water users, the plan "shall be approved." See § 37–92–305(3)(a). As relevant here, any person exposing groundwater through a gravel pit on or after January 1, 1981, must obtain approval of a plan for augmentation to replace out-of-priority stream depletions caused by evaporation of the exposed groundwater. See § 37–90–137(11)(a)-(b); *Cent. Colo. Water Conservancy Dist.*, 877 P.2d at 339–40.

¶ 30 "An essential component of an augmentation plan is the provision for adequate replacement water." *Williams v. Midway Ranches Prop. Owners Ass'n*, 938 P.2d 515, 522 (Colo. 1997). One option for securing replacement water is to change an existing water right from its decreed use to augmentation use. *Id.* at 521–22.

### 2. Changes of Water Rights and HCU Analyses

¶ 31 The right to change the use of a water right, through application and water court adjudication, is "an important stick in the bundle of rights that constitute a Colorado water right." *See Farmers Reservoir & Irrigation Co. v. City of Golden*, 44 P.3d 241, 245 (Colo. 2002) [hereinafter *FRICO v. Golden*]. However, "the right to change is not absolute." *Id.* Because water rights are usufructuary rights subject to the limitations of Colorado water law, the right to change is restrained by certain long-estab-

lished and interrelated legal principles. *See, e.g., Sedalia*, ¶¶ 17, 20–21, 343 P.3d at 22–23; *Farmers Highline Canal & Reservoir Co. v. City of Golden*, 129 Colo. 575, 272 P.2d 629, 631–33 (1954).

¶ 32 First, the amount of water that can be changed is limited to the extent of former actual usage of the water right, provided such usage was within the bounds of the use contemplated at the time of appropriation. *Santa Fe Trail Ranches Prop. Owners Ass'n v. Simpson*, 990 P.2d 46, 54 (Colo. 1999). This limitation flows from the fundamental precept that "water rights are created [only] by appropriation." *V Bar Ranch LLC v. Cotten*, 233 P.3d 1200, 1208 (Colo. 2010). A water right does not come into existence until the water is physically applied to beneficial use, which beneficial use then becomes "the basis, measure, and limit" of the water right. *Santa Fe Trail Ranches*, 990 P.2d at 53 & n. 7, 54; *see also Burlington Ditch*, 256 P.3d at 662 ("The flow rate specified in a decree ... is not equivalent to the measure of the water right, because every decree carries with it an implied provision that diversions are limited to those sufficient for the beneficial use for which the appropriation was made.").

¶ 33 Second, the change must not cause injury to the rights of other water users. § 37–92–205(3)(a); *FRICO v. Golden*, 44 P.3d at 245–46. This second limitation is closely linked to the first, as injury in change cases often involves a reduction in return flow due to expansion of a water right's former use. *See Farmers Reservoir & Irrigation Co. v. Consol. Mut. Water Co.*, 33 P.3d 799, 807–08, 808 n. 6 (Colo. 2001); *Danielson v. Kerbs Ag., Inc.*, 646 P.2d 363, 373–74 (Colo. 1982). Thus, to ensure these limitations are respected, the amount of water that can be changed to a new use "is subject to a calculation of historical beneficial consumptive use lawfully made under the decreed prior appropriation." *Burlington Ditch*, 256 P.3d at 662.

14. A plan for augmentation is defined as "a detailed program ... to increase the supply of water available for beneficial use ... by the development of new or alternate means or points of diversion, by pooling water resources, by wa-
ter exchange projects, by providing substitute supplies of water, by the development of new sources of water, or by any other appropriate means." § 37–92–103(9).

¶ 34 This HCU analysis quantifies the water right for which the change is sought based on the amount of water actually and lawfully used over time under the right, not the amount specified in the original decree. *See Widefield*, ¶¶ 19–21, 340 P.3d at 1124. Because "a proper HCU analysis measures the amount of water actually *and lawfully* used," HCU is determined not only by calculating the amount of water used during a representative time period, but also by limiting that calculation to water used on the specific acreage for which the appropriation was made. *Id.* at ¶ 21, 340 P.3d at 1124 (emphasis in original); *see also Cent. Colo. Water Conservancy Dist. v. City of Greeley (Jones Ditch)*, 147 P.3d 9, 14–16 (Colo. 2006). Absent authorization from a subsequent decree, water use on acreage other than that for which the appropriation was made constitutes an unlawful enlargement of use and cannot be included in a calculation of HCU, even where the enlarged use has persisted for a long period of time. *Burlington Ditch*, 256 P.3d at 662–63; *V Bar Ranch*, 233 P.3d at 1208–09. HCU may be quantified using either a parcel-specific or ditchwide methodology, depending on the circumstances. *See Jones Ditch*, 147 P.3d at 19.

¶ 35 The applicant seeking a change of use of a water right bears the burden of proving that the change will not injure other water users. *Kerbs Ag.*, 646 P.2d at 374. Implicit within this obligation is the additional burden of proving HCU. *See State Eng'r v. Bradley*, 53 P.3d 1165, 1170 (Colo. 2002); *see also Weibert v. Rothe Bros.*, 200 Colo. 310, 618 P.2d 1367, 1372 (1980) ("Where expansion of use is the injury asserted, establishment of historical use is the burden of the applicant."). Where, as here, "a court has never adjudicated the historical beneficial consumptive use under the original appropriation's decree, that determination must be made in the pending change case...." *Sedalia*, ¶ 19, 343 P.3d at 23. However, if the applicant fails to present evidence from which HCU can be resolved, "the application must be denied." *Bradley*, 53 P.3d at 1170.

¶ 36 Applying this framework to the facts here, we now consider whether the County carried its burden of proving HCU.

## B. The County Failed to Carry Its Burden of Proving HCU

¶ 37 The water court found that the County failed to carry its burden of proving HCU because it failed to present an accurate HCU analysis. The water court identified three crucial deficiencies in the County's analysis: first, the County failed to prove how much of the Bailey Farm Inches was historically used on the Bailey Farm; second, the County failed to prove that the full extent of the acreage claimed in its analysis was historically irrigated with the Bailey Farm Inches; third, the County failed to conduct a ditchwide analysis that considered use of the other portions of the MM water right on the Other Farms as well as use of the Bailey Farm Inches on the Bailey Farm.

¶ 38 We accept the water court's first two bases for rejecting the County's HCU analysis and agree that the County failed to carry its burden of proving HCU.

## 1. The County Failed to Prove How Much of the Bailey Farm Inches Was Historically Used on the Bailey Farm

¶ 39 As the applicant for a change of use, the County bore the burden of proving actual historical usage of the Bailey Farm Inches. *See Santa Fe Trail Ranches*, 990 P.2d at 56. To do so, the County had to accurately quantify the average amount of MM water actually diverted and applied for irrigation of the Bailey Farm over the course of the County's chosen study period. *See id.* at 54–55. The water court determined that the County's HCU analysis failed to accomplish this task. Because that determination is supported by the record, we uphold it. *Buffalo Park*, 195 P.3d at 683.

¶ 40 As noted earlier, the County's initial quantification was based on estimated water deliveries derived from a proration formula. After BW Ditch Co. records of actual deliveries from 1973 to 2000 showed the formula overestimated the amount of water delivered during that period by 37 percent, the County revised its quantification to reflect reduced

deliveries for the years 1973 to 2000 but retained its original estimates for the years 1950 to 1972. While recognizing that actual delivery records for the initial twenty-two years of the County's study period were not available, the water court nonetheless found "it stands to reason that evidence confirming the [County's] estimates for the last twenty-seven years of the study period were overestimated by 37% would give ample reason to reduce the estimates in a similar amount for the first twenty-two years of the study period." The water court further determined that the County "provided no good explanation why [such a reduction] was not done."

¶ 41 We find no basis in the record for overturning the water court's disapproval of the County's delivery estimates. To support its decision to retain the prorated estimates for the years 1950 to 1972, the County offers little more than a summary of the justifications it gave at trial, none of which persuaded the water court. For instance, the County asserts that, because there are no actual delivery records from 1950 to 1972, "[t]he factual premise that justified a reduction in the 1973 to 2000 period did not exist for the 1950 to 1972 period." But almost the opposite is true. The discovery of evidence showing that the County's formula overestimated water deliveries by 37 percent during more than half of its study period significantly undermined its reliance on that formula in the first place.

¶ 42 Contrary to the County's belief, our decision in *Wagner v. Allen*, 688 P.2d 1102 (Colo. 1984), is perfectly consistent with this conclusion. In *Wagner*, we upheld the water court's determination that applicants seeking to change the use of mutual ditch shares could sustain their burden of demonstrating HCU using a pro rata distribution formula. *Id.* at 1107–08. There, the applicants could not "establish actual shareholder-by-shareholder consumption" because there were no reliable records of specific consumption on each shareholder's property. *Id.* at 1107. Objectors argued that "an assumption of pro rata distribution cannot replace evidence of actual consumption"; but we rejected that argument "*in the context of th[at] case.*" *Id.* (emphasis added). We noted that there were

no reliable records to draw from and that "it [was] not disputed that the objectors at all times actually received at least the amount of water their pro rata ownership interests ... entitled them to receive." *Id.* We therefore held that, "*[i]n these circumstances,* ... the applicants were entitled to a presumption that water was historically used by the shareholders on the basis to which they were legally entitled to use such water." *Id.* (emphasis added). But, we cautioned, "[a] shareholder asserting that historic use differed from use based on legal ownership may, of course, attempt to rebut the presumption." *Id.* at 1108.

¶ 43 Here, the circumstances critical to our decision in *Wagner* simply are not present. The BW Ditch Co. records directly dispute any claim that the owners of the Bailey Farm Inches "at all times received at least the amount of water their pro rata ownership interest[ ] ... entitled them to receive." *See id.* at 1107. For twenty-seven of the fifty years studied, the amount of water received was 37 percent less than the amount legally endowed to the Bailey Farm Inches. These records constitute clear evidence "that historic use differed from use based on legal ownership...." *See id.* at 1108. Thus, our context-specific holding in *Wagner* is inapplicable and does not cut against the water court's decision.

¶ 44 In sum, although BW Ditch Co. did not have pre–1973 diversion records, the records it did have are sufficient to cast considerable doubt on the validity of the County's pre–1973 estimates. The water court found, and we see no reason to disagree, that the County presented no satisfactory explanation for its decision to retain those estimates. The record therefore supports the water court's determination that the County's HCU analysis failed to accurately quantify the amount of Bailey Farm Inches water historically used on the Bailey Farm, and we must uphold that determination. *See Burlington Ditch*, 256 P.3d at 660 ("The sufficiency, probative effect, [and] weight of the evidence ... are for the water court to determine; we will not disturb them on appeal.").

## 2. The County Failed to Prove the Bailey Farm Inches Historically Irrigated 101 Acres on the Bailey Farm

¶ 45 In addition to an acceptable water-quantity figure, the County had to base its HCU analysis on an acceptable acreage figure. This means the County had to prove not only that the acreage claimed in its analysis was part of the lawful place of use of the MM water right, but also that the claimed acreage was in fact historically irrigated with the Bailey Farm Inches. *See V Bar Ranch*, 233 P.3d at 1209; *accord FRICO v. Golden*, 44 P.3d at 247 ("The acreage under irrigation is the principal basis of measurement of the use of water in the adjudication of priorities...." (citation omitted)). The water court found that the County failed to satisfy this latter basic requirement. This, too, is supported by the record, and we therefore uphold it. *Buffalo Park*, 195 P.3d at 683.

¶ 46 The County's claimed 101 acres consisted of two parcels of land within the Bailey Farm: the 31-acre parcel located in the northwest portion of the property and the 70-acre parcel located in the eastern portion. However, the County offered no definitive proof that the Bailey Farm Inches were ever applied to the 70-acre parcel.

¶ 47 The record contains no statements or documentary evidence from past owners of the 70-acre parcel regarding their irrigation practices. The fact that BW Ditch Co. records show that the Bailey Farm Inches were diverted at the Bailey Farm headgate does not, without more, establish that the water was applied to the 70-acre parcel. Indeed, such diversion is wholly consistent with application of the Bailey Farm Inches on the 31-acre parcel alone. Unlike the 70-acre parcel, the 31-acre parcel is within the land owned by Martha Matthews in 1882[15] and could have been irrigated by gravity from the MM Ditch. And as the water court noted, use of the Bailey Farm Inches to irrigate 31 acres correlates to the interest in the total MM water right that those inches represent: the Bailey Farm Inches amount to 27 percent of the MM water right, and 31 acres amounts to approximately 26 percent of the acreage for which the MM water right was decreed.

¶ 48 Likewise, although the County's aerial photographs from 1949 to 1973 show the 70-acre parcel in irrigation, these photographs say nothing about the source of water being used.[16] The County received BW Ditch water as well as the Bailey Farm Inches when it acquired the Bailey Farm, and the water court found that the 70-acre parcel just as easily could have been irrigated with the former as the latter. In fact, the water court determined that the County offered no evidence at all to support its hypothesis that the 70-acre parcel was irrigated with the Bailey Farm Inches. Although the County asserts that determination is contradicted by evidence that the County quantified each water right's contribution to irrigation demand on the Bailey Farm and used a seniority-based methodology to differentiate those contributions, this argument misses the mark completely.

¶ 49 This is not a case where the water rights at issue were originally owned by the same person and attached to the same parcel of land—Martha Matthews owned the 31-acre parcel and the Bailey Farm Inches, but she never owned the 70-acre parcel or the BW Ditch half-share. Consequently, this is

---

15. Contrary to the County's position, the water court's observation of the fact that Ms. Matthews never owned the land comprising the 70-acre parcel is not tantamount to a finding that only land owned by Ms. Matthews could have been irrigated with the MM water right. Rather, the water court simply recognized that any inference of historical irrigation applicable to the 31-acre parcel did not extend to the 70-acre parcel.

16. Although we reject the County's reliance on these photographs, we also note that BW Ditch Co.'s construction of them is misleading in its own right. BW Ditch Co. states that the photographs depict an average of roughly 31 irrigated acres "within the Martha Matthews ownership" and proceeds to discuss these acres as if the photographs show nothing more. Although the photographs do show approximately 31 irrigated acres within the land once owned by Ms. Matthews, they also show the 70-acre parcel in irrigation. Because the County does not argue the claimed 101 acres were entirely within Ms. Matthews' land (and freely admits that the 70-acre parcel was not), we disagree with BW Ditch Co.'s implication that the photographs cut against the County's argument. Nonetheless, for the reasons set forth below, the photographs do not help its argument either.

not a case where the water court could assume that each right was used to irrigate the same acreage and limit its inquiry to discerning how much water from each right was used there. *Cf. Bradley*, 53 P.3d at 1170–71 (stating that, where an applicant used multiple water rights to irrigate the same land but sought to change only one of those rights, the applicant needed to provide "some way of differentiating the contributions of the various rights"). Rather, because the Bailey Farm Inches and BW Ditch water were appropriated by different people for use on separate properties which only later were consolidated into the Bailey Farm, the water court sought actual proof of where within the Bailey Farm each right was historically used.

¶ 50 The County's seniority-based methodology, which took the County's quantifications of the two water rights' relative contributions and assumed full application of the senior Bailey Farm Inches before any application of the junior BW Ditch half-share, shed no light on this crucial question. That methodology purported to demonstrate *how much of* each water right was used to satisfy the water demand on the Bailey Farm; it did not examine *where* within the Bailey Farm each right was used. On the contrary, the methodology simply assumed that both rights were used on the full 101 acres. But this is precisely what the water court sought to verify. The evidence on which the County's argument depends therefore is unresponsive to the water court's concern. Because that evidence was premised on an unsubstantiated assumption that the Bailey Farm Inches were historically used on the 70-acre parcel, it does nothing to undermine the water court's finding that the County failed to prove that assumption was correct in the first place. Thus, absent sufficient evidence of actual application of the Bailey Farm Inches to the 70-acre parcel, the water court properly determined that the County failed to carry its burden of proving the Bailey Farm Inches were historically used to irrigate 101 acres on the Bailey Farm.

¶ 51 The County's lawful place of use arguments do not affect this conclusion. The County claims the water court erred in interpreting the lawful place of use of the MM water right. In the County's view, the 1882 decree fixed—and the 1907 decree did not modify—the lawful place of use of the MM water right as 120 acres of land irrigable from the MM Ditch, which the County argues included land on both sides of the ditch. Because (1) Ms. Matthews owned land on both sides of the ditch in 1882, (2) that land amounted to approximately 101 acres, and (3) that land is encompassed in what is now the Bailey Farm, the County asserts it is entitled to claim 101 acres for the Bailey Farm Inches. According to the County, it is irrelevant that the Other Farms would be left with only 19 acres collectively because the Other Farms were not irrigable from the MM Ditch and therefore fall outside the lawful place of use and cannot claim any of the 120 acres. Yet, the County asserts, by rejecting the County's parcel-specific HCU analysis in favor of a ditchwide HCU analysis considering use on the Other Farms, the water court implicitly found that the Other Farms were, in fact, within the lawful place of use.

¶ 52 Thus, under the County's theory, the water court erred in interpreting the lawful place of use contemplated by the 1882 and 1907 decrees.[17] As a result, the County contends the water court also erred in rejecting the County's HCU analysis for failure to quantify the MM water right on a ditchwide basis and for overstating the acreage available for the Bailey Farm Inches. We find these arguments unavailing for several reasons.

---

17. The County argues this error stemmed from an antecedent interpretational error—namely, the water court's implicit conclusion that the 1882 decree was conditional rather than absolute. We need not analyze this argument. The water court did not address, let alone decide, whether the 1882 decree was conditional or absolute, and it did not need to. While a water court calculating HCU in a change case must interpret the relevant decrees in order to square its calculation with those decrees, *see Burlington Ditch*, 256 P.3d at 664, the water court cannot calculate HCU in the first place without a reliable HCU analysis presented by the change applicant, *see Bradley*, 53 P.3d at 1170. Because the County failed to present a reliable HCU analysis here, the water court need not have decided whether the 1882 decree was conditional or absolute. No answer to that question could have rectified the flaws in the County's analysis.

¶ 53 For starters, even if we accepted the County's contention that the claimed 101 acres fall within the lawful place of use of the MM water right and that the Other Farms cannot claim any of the 120 acres, these facts would not help the County here.

¶ 54 A determination that certain land is within the lawful place of use for a water right does not automatically establish that the right was actually used on that land over time. *See Widefield*, ¶ 21, 340 P.3d at 1124. Similarly, a determination that other owners of a water right cannot claim any of the acreage available under that right does not entitle the remaining owner to claim any number of acres up to the decreed amount without proof that those acres were historically irrigated with that owner's share of the water right. As we have previously made clear, "[a]n appropriator may not enlarge an appropriation, *even if the enlarged use does not go beyond the decreed amount*, without establishing all of the elements of an independent appropriation...." *V Bar Ranch*, 233 P.3d at 1209 (emphasis added). This is because downstream appropriators have rights in irrigation return flow and may not be injured by changes in the use of the water which provides that return flow. *See, e.g., City of Thornton v. Bijou Irrigation Co.*, 926 P.2d 1, 80 (Colo. 1996).

¶ 55 Here, if the Bailey Farm Inches were historically used to irrigate less than 101 acres, allowing the County to claim consumptive use for 101 acres would diminish the historical return flow from that water. This would be impermissible regardless of whether those 101 acres were within the place of use contemplated by the 1882 decree. Thus, irrespective of the merits of the County's place of use arguments, the County needed to prove actual application of the Bailey Farm Inches to 101 acres in order to use that figure as the basis for its HCU calculation.

¶ 56 Besides, we also conclude that the water court did not err in determining lawful place of use; on the contrary, the water court did not determine lawful place of use at all. Nowhere in its decision did the water court delineate a specific 120 acres of land as the intended place of use of the MM water right. The water court's finding that lands east of the MM Ditch were not irrigable from that ditch[18] was not equivalent to a determination that such lands are unlawful places of use. Rather, that finding was made in response to the County's own theory of lawful place of use and served primarily to highlight the fallacy in that theory: if the County's HCU analysis rested on the assumption that the lawful place of use could include only acreage irrigable from the MM Ditch, then the 70-acre parcel, which is higher in elevation than that ditch, necessarily would be excluded. Similarly, the water court never stated that it viewed the Other Farms as being within the lawful place of use. Given the paucity of evidence concerning where specifically the MM water right was used in 1882, it is no surprise that the water court did not make a finding as to place of use.[19]

¶ 57 Finally, in light of the foregoing discussion, we find it unnecessary to address the water court's third rationale for rejecting the County's HCU analysis—i.e., that the analysis was parcel-specific as opposed to ditchwide. As explained above, the water court also found that the analysis was based on an amount of water deliveries and an amount of acreage that the County had not proved to be accurate. These latter two grounds for rejecting the County's analysis

18. Despite the County's protests, this factual finding is amply supported by the record and we will not disturb it here. *See Burlington Ditch*, 256 P.3d at 660 ("We accept the water court's factual findings on appeal unless they ... find no support in the record."). In 1882, there were not pumps or power available to bring water from the MM Ditch to higher elevations, and the County provided no evidence that Ms. Matthews used any other technology capable of that feat.

19. Although in many cases the water court must determine the lawful place of use of a water right before it can rule on an application seeking to change that water right, *see, e.g., Jones Ditch*, 147 P.3d at 12, this typical sequence of events presupposes that sufficient evidence of place of use has been presented, *see Santa Fe Trail Ranches*, 990 P.2d at 58–59. We express no opinion as to the actual lawful place of use of the MM water right. Under the circumstances here, this is an issue best left for the water court's determination in the first instance, in the event the County or another owner of a portion of the MM water right applies for a change of use in the future.

are amply supported by the record and are themselves sufficient to establish that the County failed to carry its burden of proving HCU. The water court's reliance on an additional rationale—even if that rationale was erroneous—could not cure that failure of proof and hence would provide no basis for reversal. *See Tschudy v. Amos C. Sudler & Co.,* 158 Colo. 421, 407 P.2d 877, 879 (1965) ("The insertion of an incorrect reason ... is no ground for reversal of an otherwise correct judgment.").

¶ 58 Because the County failed to carry its burden of proving HCU, it also failed to carry its burden of showing an absence of injury to other water users. *See Santa Fe Trail Ranches,* 990 P.2d at 58. The water court therefore properly denied the County's request to change the use of the Bailey Farm Inches. *See Bradley,* 53 P.3d at 1170.

## C. The Appropriative Right of Substitution and Exchange

¶ 59 The County also argues the water court erred in denying its requested appropriative right of substitution and exchange. The County sought approval of the exchange so that it could use water leased from the City of Lafayette as a supplemental source of replacement water for its augmentation plan. The augmentation plan contemplated that the changed Bailey Farm Inches would be the primary source of supply, and that the leased water would be used to cover the relatively minor depletions projected to occur when the Bailey Farm Inches would be unavailable. Having denied the change of the Bailey Farm Inches, the water court also denied the exchange because the County had not established that the leased water was sufficient by itself to satisfy the County's replacement obligations throughout the entire year. The County does not argue the exchange will be sufficient without the water it hoped to secure by changing the Bailey Farm Inches. Accordingly, because we affirm the water court's denial of the change of use, we also affirm its denial of the exchange.

## IV. Conclusion

¶ 60 The County failed to carry its burden of proving HCU. Judgment affirmed.

JUSTICE COATS concurs in the judgment only, and JUSTICE EID joins the concurrence in the judgment only.

## APPENDIX

JUSTICE COATS, concurring in the judgment only.

¶ 61 Although I too would affirm the water court's denial of Boulder County's application, I do not join the majority opinion. Apart from the dangers of misinterpretation virtually always lurking in broad and gratuitous restatements of law, I believe there are also immediately discernible flaws in both the majority's understanding of the water court's order and its own articulation of the controlling principles of water law. I understand the issue before us today as a relatively straightforward question whether the water court made clearly erroneous findings of historical fact, but for which it would have been required, as a matter of law, to find that the applicant met its burden of proof concerning

the historical consumptive use of the water for which it sought a change decree. Whether or not the applicant's circumstantial evidence, along with the web of inferences upon which it depended, might have supported a finding in its favor, had the trier-of-fact actually been persuaded, it clearly could not, contrary to the applicant's position on appeal, compel such a finding.

¶ 62 While the sheer volume of shortcomings in the applicant's circumstantial case identified by the water court may have contributed to the majority's partial misreading of its order, it is nevertheless abundantly clear that the water court was unpersuaded that the 50 inches of water associated with the Bailey Farm, representing approximately 27 percent of the 1882 Martha Matthews decree, were put to their decreed use during the representative period; and the court made reasonably clear that it was unconvinced in two fundamentally different respects, either of which was sufficient to deny the change application. First, the court was unconvinced, as a factual matter, that the 101 acres of land upon which that water was purportedly used were included among the 120 acres for which its use for irrigation was decreed; and second, the court was unable to ascertain from the applicant's evidence how much, if any, of the 50 inches for which a change was sought, as distinguished from water from other sources altogether, was historically used to irrigate the subject land, even if that land were included in the original decree.

¶ 63 With regard to the first of these reasons, it is no longer subject to debate in this jurisdiction that regardless of the amount of water for which an appropriation was decreed, a change of the decreed right may itself be decreed only for that amount of water that has been beneficially used as decreed over a historically representative period. *See, e.g., Wolfe v. Sedalia Water & Sanitation Dist.,* 2015 CO 8, ¶ 21, 343 P.3d 16, 23. Although it was disputed by the applicant, the water court found from both the location of the Martha Matthews Ditch and the relief of the surrounding land that it would have been, as a matter of historical fact, physically impossible to irrigate 70 of the subject acres at the time of the original decree. To demonstrate (even if the applicant had convincingly done so) that the so-called Bailey Farm 50 inches were historically applied to the irrigation of 101 acres, 70 of which could not possibly have been among the acres designated for use in the decree, would therefore have been facial proof that a large portion of the water in question had not been put to the beneficial use for which it had been decreed and did not represent the measure of a water right subject to change.

¶ 64 With regard to the second of these reasons, the water court, in rapid succession, identified a host of gaps in the applicant's circumstantial proof, which left the court unconvinced about the quantity of Bailey Farm water historically applied to the irrigation of the subject 101 acres, as claimed. The court found unreliable, for example, a model projecting deliveries to the Bailey Farm on the basis of its pro rata share of verifiable deliveries of all decreed 185 inches of Martha Matthews water through the Boulder and Weld County Ditch Company ditch, for the simple reason that for the almost half of the representative period for which actual delivery figures to Bailey Farm were available, this model resulted in an overestimation by almost 37 percent. The court also found that doubts were raised by aerial photos taken over roughly half of the representative period, which indicated that on average only a fraction of the total acreage owned by Martha Matthews was regularly under irrigation. Most importantly, however, the court found that despite substantial evidence that less than all of Martha Matthews's land was historically irrigated by the decreed water; that a substantial amount of the decreed water was transferred to users miles downstream; and that at least some portion of the Martha Matthews acreage was irrigated by her one-half share of Boulder and Weld County Ditch Company water, the applicant made no attempt either to locate and quantify the amount of mutual ditch company water used on Martha Matthews's land or to account for usage of the remainder of the 185 inches making up the 1882 decree, of which the 50 inches in question represented, but were never separately decreed for, approximately 27 percent.

¶ 65 Because virtually any, and at least multiple possible combinations, of the trier-of-fact's stated reasons would provide adequate justification for its doubts about the applicant's circumstantial proof, I consider it unnecessary, and in fact counterproductive, to treat the water court's reasons for doubting the conclusiveness of the evidence in this case as mandates for proving historical consumptive use in the general case. By doing just that, however, I believe the majority opinion not only mischaracterizes the nature of the water court's order but, in at least certain respects, seriously misstates the governing law. In one particular, it appears to me that the majority misperceives the nature of the water court's concern about undifferentiated sources of water being used on the same acreage, and it appears to mandate that the applicant identify a specific amount of acreage that has been both fully and exclusively irrigated by the water for which a change in use is sought. *See* maj. op. ¶¶ 48–54. To the extent this is so, I believe the majority not only misunderstands the water court's rationale but similarly misstates our established requirements concerning the proof of historical consumptive use.

¶ 66 By contrast, I believe the water court correctly understood that multiple water rights being used to irrigate the same acreage may be subject to a change decree, as long as their relative contributions to the duty of water are in some manner or another demonstrated, *see State Eng'r v. Bradley*, 53 P.3d 1165, 1170 (Colo. 2002), and notwithstanding the applicant's assertion to the contrary, that such undifferentiated usage need not, as a matter of law, be credited for change purposes as having come exclusively from the senior right, up to the point at which that right has been fully exhausted. In light of the applicant's inability to more directly establish that the Bailey Farm 50 inches of Martha Matthews water were all applied to the subject acreage, the water court simply observed that even if the applicant successfully proved that the 101 acres in question were within the decreed 120 acres, and even if it proved that water belonging to Martha Matthews had been applied to the irrigation of this acreage, the applicant nevertheless failed to prove the amount of BW Ditch water also attributable to the irrigation of her land. Furthermore, in the absence of the applicant's ability to more directly prove the amount of BW Ditch water applied to that same acreage, the water court noted that no ditch-wide analysis of mutual ditch company water was offered to help quantify the amount of beneficially used water represented by the Martha Matthews half-share.

¶ 67 Finally, without resolving it, the majority implies that there is some question about the significance, which the water court clearly found, of accounting for the use of the remainder of the Martha Matthews 185 inches. For the reasons I have already noted, I consider it unnecessary to have addressed this portion of the water court's explanation at all, but since the majority has done so, in fairness to the water court I feel obliged to indicate that I believe it raises a conceptually significant question about the applicant's proof. Although there seemed to be no dispute that the originally decreed water had been divided in some manner into four distinct shares or portions, for the benefit of different individuals, on different properties, there was no suggestion that separate water rights were ever decreed for any of those portions. The water court was clearly concerned that by accepting the applicant's designation of the 120 acres for which the Martha Matthews water was decreed, 101 of which it claimed were irrigated by its 27 percent to the exclusion of the remainder of that water, the court would, at one and the same time, be finding that virtually none of the remaining 135 inches could ever be found to have been beneficially used as was decreed in 1882, without expanding the right. It was in this regard, and especially in light of the applicant's claim of entitlement to an additional 50 of the 185 inches, applied to land it owned elsewhere, that the water court found the applicant's proof inadequate, in the absence of more definitive evidence concerning the use of all 185 inches granted in the decree.

¶ 68 Fundamentally, however, I believe the question before us is easily resolved as a matter of form. In a change of water right proceeding, the applicant must prove by a preponderance of the evidence the historical

consumptive use of the water right for which it seeks a change, and it must do so to the satisfaction of the water court, which acts as the trier-of-fact. In the absence of clearly erroneous findings of historical fact or either misunderstandings or misapplications of controlling principles of law, which even the majority believes the applicant has failed to demonstrate, the water court's ruling is subject to reversal, not simply whenever that court could have found in the applicant's favor, but rather only if it could not have reasonably found otherwise. As the water court made clear, a number of inferences could reasonably be drawn from the circumstantial case presented to it, but it was not persuaded to draw all those inferences necessary to find proof of historical consumptive use by a preponderance of the evidence.

¶ 69 I therefore concur in the judgment of the court but not its opinion.

I am authorized to state that JUSTICE EID joins this concurrence in the judgment only.